**STEVENS PARK OSTEOPATHIC
HOSPITAL, INC.**

v.

**The UNITED STATES.**

No. 275–78.

United States Court of Claims.

Sept. 10, 1980.

**1374**

James W. Malloy, Chicago, Ill., attorney of record for plaintiff; Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., of counsel.

Nancy R. Sills, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This claim for medicare reimbursement is before us on the parties' cross–motions for summary judgment pursuant to Rule 101. Jurisdiction of this court is grounded in the Tucker Act, 28 U.S.C. § 1491. *St. Elizabeth Hospital v. United States,* 214 Ct.Cl. 322, 558 F.2d 8 (1977); *Whitecliff Inc. v. United States,* 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

Plaintiff, Stevens Park Osteopathic Hospital, Inc., is located in Dallas, Texas, and is a qualified provider of medical services under Part A of the Medicare Plan, 42 U.S.C. §§ 1395 *et seq.,* (the "Medicare Act"), and, thus, is entitled to reimbursement for reasonable cost incurred in the delivery of needed health services. 42 U.S.C. §§ 1395f(b); 1395g, 1395(v)(1)A. At issue in this case is the exact amount of the reasonable cost incurred by plaintiff during its fiscal years 1967 to 1972. Specifically, plaintiff asserts that under 20 C.F.R. § 405.-415 it is entitled to a larger depreciation allowance, based upon its historical cost of acquiring its plant in 1967, than that allowed by the intermediary, Blue Cross Plan. Additionally, plaintiff claims under 20 C.F.R. § 405.419 that it should be reimbursed for interest paid on loans granted it by Stevens Park Investors, Inc. to finance the purchase of these assets. Stevens Park Investors, Inc. (hereinafter "the proprietary corporation"), was an organization related to plaintiff by common ownership or control and was liquidated in 1967 after plaintiff purchased one hundred percent of its outstanding stock. Finally, pursuant to 20 C.F.R. § 405.428, plaintiff claims entitlement to a derivative cost of 2 percent of "allowable costs" for fiscal years ending June 10, 1967, 1968, and 1969. (The texts of the pertinent regulations are quoted *infra.* We note that Title 20 of the Code of Federal Regulations was amended to Title 42 in 1976 without any change. Citations in this opinion will be to Title 20 since that was the law at the time of the transactions in this case.)

For reasons discussed herein, we deny all parts of plaintiff's claim and uphold the intermediary's adverse decision.

The facts of this case are as follows. Plaintiff and the proprietary corporation were both formed in 1948 by three Dallas osteopathic doctors, although one of the three (hereinafter referred to by us as he consistently has been by the parties as "Dr. X") could be considered the prime mover in this business venture. The proprietary corporation owned the clinic in which the doctors practiced. Plaintiff was formed to serve as a hospital for the same community as the clinic; its initial facilities were in the clinic building owned by the proprietary corporation.

In 1957, Dr. X, who owned 75 percent of the shares of the proprietary corporation, and the other owners of the proprietary corporation, began discussing the need for a separate building to house the hospital. The major difficulty was financing. Dr. X solved this by obtaining a million dollar mortgage loan at a local bank personally guaranteed by him, while the other doctors who were also shareholders in the proprietary corporation contributed funds to meet the rest of the costs for constructing the separate hospital facility. Thus, it was

through the proprietary corporation that the hospital facility now in dispute was constructed. Upon its completion in 1962, the proprietary corporation began leasing the facility to plaintiff at $15,000 per month. On numerous occasions after taking occupancy of the new facility, plaintiff defaulted in paying its rent and also had to borrow money from the proprietary corporation to meet other current obligations, such as payroll. Plaintiff often obtained loans from the proprietary corporation to meet operating expenses, in exchange for which the latter would receive unsecured short-term notes. Moreover, it was Dr. X who put up the bulk of the money to be loaned to plaintiff. At one time the loans covering rent and other operating costs amounted to $180,000. At the time of the sale of the facility to plaintiff the loans amounted to $152,000.

Attempting to alleviate plaintiff's financial woes somewhat, the proprietary corporation chose to lower the rent to $12,000 per month. Still, plaintiff could not always meet even this amount. At about the time of the passage of the Medicare Act in 1965, plaintiff's certified public accountant and Dr. X began to talk to other shareholders of the proprietary corporation about the necessity of selling plaintiff the facilities it was using. They felt it would be more feasible for plaintiff to own its own facilities under the Medicare Act and, in addition, they felt they would gain relief under a Texas tax program. Eventually, the accountant and Dr. X got the other shareholders of the proprietary corporation to agree to sell. The transaction was structured as a sale of stock for tax purposes. The total price was $1,800,000. For this plaintiff obtained the hospital it was leasing as well as those assets of the proprietary corporation used as a clinic. As soon as the sale of stock was effected, the proprietary corporation was liquidated and its assets transferred to plaintiff. Plaintiff then sold the clinic building and equipment for approximately $300,000. Thus in effect, plaintiff paid $1,500,000 to obtain the hospital assets. These assets had a net book value in the hands of the proprietary corporation of

$950,000. The purchase price consisted of the assumption of a first lien deed of trust on the hospital building of $864,000 and the long-term notes amounting to $635,573 given to the former shareholders of the proprietary corporation. Included in the corporate assets, and in part paid for by the notes delivered to the shareholders, was the $152,293 owed by plaintiff to the proprietary corporations for past rent due and for advances to pay operating expenses.

From July 1, 1966, the date on which plaintiff entered the Medicare program, until March 28, 1967, the date on which plaintiff purchased the hospital facility, the ties between plaintiff and the proprietary corporation were very close. Dr. X owned 75 percent of the issued and outstanding shares of the proprietary corporation. Dr. X was on the plaintiff's board of directors, was chairman of its executive committee, and was active in its management. In addition, three other doctors who sat on plaintiff's board of directors owned an additional 10 percent of the proprietary corporation's stock. In all, the proprietary corporation shareholders held four of the nine positions on plaintiff's board of directors. A fifth member of plaintiff's nine-member board was the accountant who was in charge of the financial planning of both plaintiff and the proprietary corporation.

Following the sale of the hospital facility, plaintiff claimed depreciation on the basis of its historical acquisition cost. It also claimed interest expense for the notes financing the purchase of the building assets. Finally, plaintiff claimed entitlement to a derivative cost of 2 percent of "allowable costs" under 20 C.F.R. § 405.428.

The Blue Cross plan (hereinafter "the Plan"), denied each of plaintiff's claims essentially because it found plaintiff and the proprietary corporation related as a matter of fact by virtue of common control. More specifically, the Plan pointed to the dominant role played by Dr. X in the management and control of both the proprietary corporation and plaintiff. The Plan maintained that the proprietary corporation, dominated by Dr. X, controlled or was in a

position to control plaintiff by virtue of having four of nine directorships. Thus, the Plan concluded that since common control existed within the meaning of 20 C.F.R. § 405.427, it could not recognize and increase in the cost basis of plaintiff's assets resulting from the sale between the clinic and the hospital. Specifically, the Plan substituted the seller's historical cost for the buyer's cost in determining allowable depreciation allowance for assets acquired in 1967. In addition, the Plan stated it could not recognize the interest paid to the former shareholders of the proprietary corporation on the notes given to finance the purchase because the notes represented a loan from a related organization and interest on such loans is specifically disallowed under 20 C.F.R. § 405.419(c)(1). Finally, because it was not recognizing any "allowable costs" under 20 C.F.R. § 405.428, the Plan denied plaintiff's claim for the 2 percent derivative costs.

At the Medicare Provider Appeal Hearing, plaintiff made a twofold argument. First, plaintiff contested the Plan's assertion that it was under common control with the proprietary corporation. We need not linger to detail plaintiff's arguments. The issue is primarily factual and so not within the scope of our review, and is not urged by plaintiff here.

Secondly, plaintiff argued that even if the sale of the facility was between related parties, the terms and conditions of the sale were fair and equitable. Therefore, plaintiff concluded, the costs flowing from the transaction should be recognized. To establish the premise that the terms of the sale were fair, plaintiff introduced an appraisal made by a recognized appraisal company of the fair market value of the hospital facilities in 1967 of $1,432,000. Plaintiff noted that the $1,500,000 actually paid for the facility, after excluding the preexisting debts to the proprietary corporation, was less than the fair market value at that time. Plaintiff argued that these facts demonstrate that there was no undue profit to the shareholders of the proprietary corporation. Next, in attempting further to establish the equity of the sale, plaintiff argued that the

rate of interest paid on the loans from the former shareholders was below the rate of interest at which the plaintiff could have borrowed funds from a commercial lender. Plaintiff then noted that it was doubtful that it could have obtained a loan from a commercial institution.

The conclusion flowing from this premise, argued plaintiff, was that the costs resulting from the sale are reimbursable because they are reasonable. Plaintiff argued that under the Medicare Act, Congress intended that the program pay its share of plaintiff's operating costs, no more, no less. Disallowing all transactions between related organizations without reference to whether the transaction was reasonable, would be a violation of the principle that the program pay only its share, as it would shift the unreimbursed costs to other purchasers of plaintiff's services. More specifically, plaintiff contended that the related organization rule set out in 20 C.F.R. § 405.427 was intended merely to prevent a pyramiding of profit between related parties and that where there is no self-dealing, the regulation need not be applied. Thus, plaintiff concluded that since 20 C.F.R. § 405.415 permits depreciation where there is an acquisition of an ongoing business, the fair market value of the assets acquired should be the basis for depreciation.

Likewise as to the interest expense claim, plaintiff contended that 20 C.F.R. § 405.-419(c)(1), which indicates that interest, to be allowable, must be incurred on indebtedness established with lenders not related through control to the borrower, was only designed to make certain that loans were really necessary. Plaintiff concluded that it had demonstrated that the loans made were necessary and made under terms more than reasonable and thus its claim for interest should be allowed.

In affirming the Plan's adjustments, the hearing officer arrived at three conclusions. First, the hearing officer agreed and found that, as of the date plaintiff entered the Medicare program in July of 1966, it was related to the proprietary corporation by

virtue of common control and remained related through the completion of the transaction through which plaintiff acquired its assets. Referring to Dr. X, the hearing officer wrote:

> * * * Because of his position of dominance in the area of medicine he practiced in the community, because of his substantial relationships with the provider [plaintiff], including his position on the provider's board, and because of his ownership of 75% of the outstanding stock of the clinic [proprietary corporation], the Hearing Officer concludes that there is every evidence that Dr. X had the power directly or indirectly significantly to influence or direct the actions or policies of the provider and the clinic within the definition of "control" contained in Regulation Section 405.427(b)(3). The fact that Dr. X may never had [sic] exercised such control is of no consequence.

Following this conclusion that the parties were in fact related, the hearing officer then denied plaintiff's request for depreciation and interest reimbursements. As to the depreciation, the hearing officer stated:

> * * * Although the sale of the hospital assets to the provider was handled through the device of the provider purchasing clinic stock, the reality of the transaction was that the provider purchased the clinic's assets. The clinic shareholders reached agreement among themselves as to the sales price and therefore the same price per share was paid to each clinic shareholder. Section 1008 in Chapter 10 of HIM–15 indicates that where a facility is purchased from a related organization, the purchaser must use the seller's cost basis as its own for purposes of depreciation.

And in denying plaintiff's claim for interest expense reimbursement, the hearing officer wrote:

> * * * Finally, the notes given to clinic shareholders represented loans from a related organization and therefore under Regulation Section 405.419(c)(1), interest on these notes is not allowable. While the notes were given to the 17 shareholders of the clinic corporation and not to the clinic itself, the notes still constitute a loan from a related organization. First of all the great percentage of that $635,-573 notes were given to Dr. X who owned 75% of the clinic stock. As the Hearing Officer has concluded that Dr. X was in a control position vis–a–vis the provider, it is clear the notes given to him represent a loan from a related entity. However, the Hearing Officer believes that, since the sale was really a sale of assets, effected by a sale of stock for tax reasons only, and since the price was agreed to jointly by all shareholders, the sale should be treated no differently than one in which assets are purchased directly, from the selling corporation and are given to that organization. Therefore, none of the interest is allowable since it was incurred on a loan from a related organization.

Finally, the hearing officer flatly rejected plaintiff's argument that transactions between related parties may, nonetheless, be recognized where the terms and conditions of such transactions are fair. He stated:

> * * * The regulation section creating the related organization rule, 405.427, no where indicates that a transaction between related parties will be recognized if it is fair. The only situation in which the intermediary is directed to evaluate the terms and condition of a sale between related parties is provided in Section 405.-427(d). That exception applies only to a sale by a related supplying organization of an item or service which it is in the business of selling to the general public or to the hospital industry. Plainly, the clinic organization was not in the business of constructing hospitals and, therefore, this exception does not apply.

The hearing officer noted his decision should not be regarded as an indication that plaintiff was guilty of unfairness in its dealings with the proprietary corporation since the relevant regulations governing this situation do not call for such an inquiry.

On appeal to this court, plaintiff argues that the hearing officer's decision is arbi-

trary, capricious, and contrary to law. Thus, we are confronted with the following issues:

I. Whether the hearing officer at the Blue Cross Association Medicare Provider Appeal Hearing properly applied the Medicare regulation that requires a seller's historical basis to be used to calculate a depreciation allowance for a transaction where the seller and the buyer are related by common ownership or control.

II. Whether the hearing officer properly applied the Medicare regulation that does not permit a provider to claim interest payments as an "allowable cost" if the lender is related to the borrower by common ownership or control.

III. Whether certain derivative costs are allowable.

■ Before turning to these issues, we note the limited standard of review in this court of medical provider cases. As we stated in *Gosman v. United States*, 215 Ct.Cl. 617, 621–22, 573 F.2d 31, 34 (1978), in upholding the hearing panel's decision:

\* \* \* [I]t is settled that our scope of review in this type of case is limited; the decisions of the Hearing Panel are to be examined for compliance with the Constitution, statutory provisions, and regulations having the force and effect of law, as well as for the taint of arbitrariness, capriciousness, or lack of support in substantial evidence. \* \* \*. [Cases omitted]

■ In general, we think the challenged regulations were necessary and proper to effectuate the purposes of the Act, and that they were correctly applied by the intermediary in view of its fact–findings which had the support of substantial evidence.

## I. *Depreciation*

On appeal, plaintiff makes two arguments regarding the reimbursement of its depreciation expenses which it contends should be based upon its historical cost of the facility, and not that of the seller. First, plaintiff contends that its situation is governed by 20 C.F.R. § 405.415(a)(2), (b)(1) and (g). Section 405.415(a)(2) reads:

§ 405.415 Depreciation: Allowance for depreciation based on asset costs.

(a) Principle. An appropriate allowance for depreciation on buildings and equipment is an allowable cost. The depreciation must be:

\*    \*    \*    \*    \*    \*

(2) Based on the historical cost of the asset or fair market value at the time of donation in the case of donated assets;

Section 405.415(b)(1) reads in part:

(b) Definitions—(1) Historical costs. Historical cost is the cost incurred by the present owner in acquiring the assets. \*    \*    \*

Finally, Section 405.415(g) states in part:

(g) Establishment of cost basis on purchase of facility as an ongoing operation. In establishing the cost basis for a facility purchased as an ongoing operation after July 1, 1966, the price paid by the purchaser shall be the cost basis where the purchaser can demonstrate that the sale was a bona fide sale and the price did not exceed the fair market value of the facility at the time of the sale. The cost basis for depreciable assets shall not exceed the fair market value of those assets at the time of the sale. If the purchaser cannot demonstrate that the sale was bona fide, the purchaser's cost basis shall not exceed the seller's cost, less accumulated depreciation.

As it did before the hearing officer, plaintiff again relies on evidence in the record that the terms and conditions of the sale were fair and equitable and that no undue profit was made by the seller. Thus, plaintiff concludes that under the regulatory scheme cited above, it should be reimbursed for depreciation expenses based upon its historical cost of the hospital facility. We disagree.

■ In its motion for summary judgment, plaintiff does not now contest a key finding of the hearing officer–that plaintiff and the proprietary corporation were related by common control under 20 C.F.R. § 405.427. This finding was neither arbitrary nor capricious and the attendant cir-

cumstances provide support by substantial evidence, as plaintiff no longer denies. Therefore, it is not alone the regulatory scheme as cited by plaintiff that controls but rather 20 C.F.R. § 405.427(c)(2), a special rule for transactions between related organizations. 20 C.F.R. § 405.427(c)(2) reads, in part:

> (2) Where the provider obtains items of services, facilities, or supplies from an organization even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself * * *. Therefore, reimbursable cost should include the costs for these items at the cost to the *supplying organization.* [Emphasis supplied.]

Thus, 20 C.F.R. § 405.427(c)(2) clearly dictates that in a transaction between related organizations for the purchase of facilities, it is the *seller's* cost of the assets that is the basis for the buyer's depreciation expense. Moreover, 20 C.F.R. § 405.427(c)(2) does not call for an inquiry into the fairness or equity of a transaction between related parties. This regulation, like other "related organization" rules, is intended to have a "prophylactic" effect in guarding against bad faith dealing between organizations related through common control without inquiry into particular circumstances. *Hillside Community Hospital of Ukiah v. Mathews,* 423 F.Supp. 1168 (N.D.Cal.1976). *See also Trustees of Indiana University v. United States,* 223 Ct.Cl. ——, ——, 618 F.2d 736, 740–41 (1980), and *Pasadena Hospital Ass'n, Ltd. v. United States,* 223 Ct.Cl. ——, 618 F.2d 728 (1980). 20 C.F.R. § 405.427(c)(2) specifically recognizes that related organizations should be treated as a single entity for purposes of determining reasonable costs because the provider is, in effect, obtaining the facilities from itself. It is evident that inquiry into the fairness of transactions between related parties would be a demanding task indeed for the fiscal intermediary, while inquiry into the usually simpler issue of common control probably would have to take place anyway.

Nevertheless, in setting forth its second argument, plaintiff contends that 20 C.F.R. § 405.427(c)(2) should not be applied because this regulation, by its own terms, applies only where the related organizations have been engaged in an ongoing series of transactions in contrast to a single purchase and sale. Plaintiff cites 20 C.F.R. § 405.-427(c)(2) which provides, among other things:

> (2) Where the provider obtains * * facilities * * * from an organization * * * owned or controlled by the owner(s) of the provider * * *. An example would be a corporation building a hospital * * * and then leasing it to another corporation controlled by the owner.

Plaintiff contends that its construction of 20 C.F.R. § 405.427(c)(2) is supported by a district court decision, *South Boston General Hospital v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va.1976). In that case the court refused to apply § 405.427 to a purchase and sale between related parties, stating that as a precondition to its application, the related parties must be presently engaged *in an ongoing relationship. Id.* at 1383–1384. The related parties in that case had not carried on previous transactions but engaged only in a solitary purchase and sale from each other.

We reject plaintiff's argument and find *South Boston* distinguishable. Plaintiff would have us apply § 405.427 only when the related parties are engaged in an ongoing relationship and not when two related parties, who had not carried on previous transactions, engage in a single purchase and sale from one another. The facts in our case fall in the middle of these two boundaries—plaintiff and the proprietary corporation were engaged in an ongoing relationship from 1962 to 1967 in the form of a lease arrangement. On March 28, 1967, plaintiff's ongoing relationship with the proprietary corporation culminated with plaintiff's purchase of the hospital facility. Prior to this purchase, plaintiff had defaulted in paying its rent on several occasions and had to borrow from the proprietary corporation. The purchase price of the hos-

pital facility included those rental payments still due and was paid for by loans made by the former lessors. Thus, we have the case where two related parties maintained close business ties for approximately six years in the form of a lease arrangement and then culminated this close relationship with an outright sale of the leased facilities. The related parties were often in the posture of borrower and lender and the purchase price included those rental payments still owed to the proprietary corporation.

Recognizing the prophylactic purpose of § 405.427, we think this regulation was intended to cover the facts of this case. There seems to be no reason why the authors should have wished to restrict it to the situation the plaintiff postulates. We have no reason to question the good faith of the doctors here involved, yet the transactions we have described are such as, if anticipated, would have suggested a need for the regulation. We think the facts of this case invoke the protections of § 405.427. Not to apply § 405.427 in this situation would violate the clear public policy behind the regulation.

As we noted, the facts of this case are not those of *South Boston*. There the two related parties engaged in a single purchase and sale and had not engaged in previous transactions. The court thus thought it appropriate, and we do not now agree or disagree, that in such a case the harsh and inflexible rules of § 405.427 should not be applied. Rather, the court ruled that in such a case, the bona fide nature of this single transaction be scrutinized by the Secretary.

It may be that in such a situation as *South Boston*, the "strait–jacket" rules of § 405.427 may not be appropriate. But we do not have that case before us. Moreover, the facts of our case are much more compelling in terms of calling into play the rules of § 405.427. The two related parties in our case had engaged in a lease agreement for about six years, had often been in a borrower–lender relationship and had culminated a long history of previous transactions with a purchase and sale. We believe that it

would require an artificial interpretation of § 405.427 by us to hold, as plaintiff would have us hold, that § 405.427 does apply to an ongoing lease arrangement but does not apply where, as here, a lease arrangement is culminated in a purchase and sale between the related parties and such purchase price includes past rent due and is paid for by loans made by the former lessor. There is some reason to believe that the transaction terms would, if effectuated by the intermediary, have thrown on to Medicare some of the losses incurred before Medicare started. In such a situation, we must look to the nature of the *entire relationship* and not be blinded by the fact that a purchase and sale occurred at the end of a long and close business relationship between the parties.

Thus, we uphold the hearing officer's conclusion that § 405.427(c)(2) operates to deny plaintiff any reimbursement for its depreciation expense.

## II. *Interest expense.*

The hearing officer denied plaintiff's request for reimbursement of its interest expense on the notes given to clinic shareholders under 20 C.F.R. § 419(c)(1) because he concluded that these notes represented a loan from a related corporation and thus were not allowable under 20 C.F.R. § 405.-419(c)(1). That section reads:

(c) *Borrower–lender relationship.* (1) To be allowable, interest expense must be incurred on indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to the borrower. Presence of any of these factors could affect the "bargaining" process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans. Loans should be made under terms and conditions that a prudent borrower would make in arms length transactions with lending institutions. The intent of this provision is to assure that loans are legitimate and needed, and that the interest rate is reasonable. Thus, in-

terest paid by the provider to partners, stockholders, or related organizations of the provider would not be allowable. Where the owner uses his own funds in a business, it is reasonable to treat the funds as invested funds or capital, rather than borrowed funds. Therefore, where interest on loans by partners, stockholders, or related organizations is disallowed as a cost solely because of the relationship factor, the principal of such loans shall be treated as invested funds in the computation of the provider's equity capital under § 405.429.

On appeal, plaintiff challenges the hearing officer's decision in two ways: First, plaintiff contends that the hearing officer assumed that the loans were from the proprietary corporation and not from individual shareholders. Plaintiff claims the hearing officer glossed over the "unquestionable separate" shareholders' loans of $635,573. At most, says plaintiff, only the loans from Dr. X would be prohibited by 20 C.F.R. § 405.419(c)(1). We disagree.

■ After examination of the record, the hearing officer specifically concluded that the loans from the clinic shareholders to the plaintiff were given as part of an overall scheme or plan devised by the joint owners of Stevens Park Investors and Stevens Park Osteopathic Hospital, Inc., and, therefore, all of the loans should be treated as being loans from a related organization under 20 C.F.R. § 405.419(c)(1). The relevant portion of the hearing officer's decision reads:

> While the notes were given to the 17 shareholders of the clinic corporation and not to the clinic itself, the notes still constitute a loan from a related organization. First of all the great percentage of that $635,573 notes were given to Dr. X who owned 75% of the clinic stock. As the Hearing Officer has concluded that Dr. X was in a control position vis-a-vis the provider, it is clear the notes given to him represent a loan from a related entity. However, the Hearing Officer believes that, since the sale was really a sale of assets, effected by a sale of stock for tax reasons only, and since the price was

agreed to jointly by all shareholders, the sale should be treated no differently than one in which assets are purchased directly, from the selling corporation and are given to that organization. Therefore, none of the interest is allowable since it was incurred on a loan from a related organization.

These conclusions are factual and we note again the limited scope of our review. We find supported by substantial evidence the hearing officer's assessment that the loans were given as a part of an overall plan by the joint owners of Stevens Park Investors and Stevens Park Osteopathic Hospital, Inc., and as such were loans from a related organization. We think that to accept plaintiff's interpretation that this situation merely involved several separate, individual loans from each shareholder to plaintiff would be to exalt form over substance. Rather, it could well seem to a reasonable trier of fact to be necessary to "pierce the veil," so to speak, and to characterize the situation as a sale between two related parties. Thus, we conclude that the finding of the hearing officer was neither arbitrary nor capricious and is supported by substantial evidence.

■ Plaintiff's second argument involves a substantive attack on 20 C.F.R. § 405.-419(c)(1) and 20 C.F.R. § 405.429 which sections plaintiff claims draw an arbitrary and capricious distinction between profit and nonprofit organizations in a related parties loan setting. Section 405.429 reads in part:

> § 405.429 Return on equity capital of proprietary providers.
>
> (a) Principle. (1) A reasonable return on equity capital invested and used in the provision of patient care is allowable as an element of the reasonable cost of covered services furnished to beneficiaries by proprietary providers. The amount allowable on an annual basis is determined by applying to the provider's equity capital a percentage equal to one and one-half times the average of the rates of interest on special issues of public debt obligations issued to the Federal Hospital Insurance Trust Fund for each of the

months during the provider's reporting period or portion thereof covered under the program.

(2) For the purposes of this subpart, the term "proprietary providers" is intended to distinguish providers, whether sole proprietorships, partnerships, or corporations, that are organized and operated with the expectation of earning profit for the owners, from other providers that are organized and operated on a nonprofit basis.

As plaintiff interprets these two regulations, § 405.419(c)(1) first acts to deny all providers any reimbursement for interest expense on a loan from a related party, then § 405.429 allows only a *profit* provider to reclassify the interest expense as a portion of net equity for a more favorable return. Plaintiff contends that a nonprofit provider such as itself is not afforded such treatment under the regulations in a related party situation but is simply denied an interest expense reimbursement under § 405.419(c)(1). Plaintiff argues that the discrimination between profit and nonprofit organizations is arbitrary and capricious citing as support *Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009 (D.C.Cir.1979). Plaintiff contends that because such distinction is arbitrary, a nonprofit provider like itself ought to be allowed to treat its interest expense under a reclassification of the principal of the loans as "equity" for calculation of a 1½ percent return thereon under § 405.429. As support for this proposition, plaintiff cites to a Provider Reimbursement Review Board Hearing Decision, No. 79–D95, decided December 17, 1979.

We disagree with plaintiff for several reasons. First and foremost, we do not find that the distinction between profit and non-profit providers which emerges from 20 C.F.R. § 405.419(c)(1) and 20 C.F.R. § 405.-429 to be arbitrary or capricious. Rather we find this distinction to be "reasonably related to the purposes of the enabling legislation." *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). Our conclusion that such a distinction is reasonable is substantiated by the language

of § 405.429 itself as well as its legislative history. The pertinent language of the regulation reads:

(b) *Application—(1) Computation of equity capital.* Proprietary providers generally do not receive public contributions and assistance of Federal and other governmental programs in financing capital expenditures. Proprietary institutions historically have financed capital expenditures through funds invested by owners in the expectation of earning a return. A return on investment therefore, is needed to avoid withdrawal of capital and to attract additional capital needed for expansion.

This language points out that the reason for the profit–non–profit distinction is the difference in the funding experiences of proprietary and nonproprietary providers. Moreover, the legislative history of this regulation further demonstrates that this distinction is reasonably related to the purpose of the Medicare Act. The Committee Staff Report from the Committee on Finance of the United States Senate reported:

Non–profit institutions have financial advantages not available to proprietary facilities:

(a) The billions of dollars in grants under Hill–Burton, together with the billions more which the proposed Hospital Modernization bill would authorize, have not been, and would not be, available to proprietary facilities.

(b) Non–profits are granted tax–exemption unlike the proprietaries.

(c) Charitable contributions, private grant–in–aid and endowment funds are available to non–profit institutions, but are seldom, if ever, available to proprietary facilities.

It appears reasonable to assume that non–profit institutions would expect to be reimbursed only for their normal costs of providing care. They are not ordinarily paid a "return on investment." The hearings, executive sessions, and reports on the Social Security Amendments of 1965, do not reveal any demand or expec-

tation of such a return. The cost estimates for the program did not include such a factor.

On the other hand, it is equally reasonable to assume that a proprietary facility would expect recognition of the cost of attracting and retaining capital. Unlike non–profit institutions, the proprietary facility normally does anticipate a return on its capital investment. The expectation and realization of a return on investment is the essential motive behind establishment and continuation of a proprietary health facility. In contrast, "public service" is the prime motive for the existence of the non–profit institution.

Without expectation of a "return on capital" there would be little incentive for the development and participation of proprietary institutions necessary to the successful provision of services to beneficiaries of this program. * * * [From the Reimbursement Guidelines for Medicare Hearing Before the Committee on Finance, U. S. Senate, 89th Cong., 2d Sess. (May 25, 1966).]

Thus, it is our conclusion that a distinction between profit and nonprofit providers is a rational one and must be upheld under *Thorpe v. Housing Authority of the City of Durham, supra.*

This conclusion to uphold the profit–nonprofit provider distinction and thereby deny plaintiff a return on equity capital under 20 C.F.R. § 405.429 is adhered to in two recent decisions of the Secretary of Health, Education, and Welfare. *Indiana Hospital Association Group Appeal No. 1 v. Blue Cross Association/Mutual Hospital Insurance, Inc.*, HFCA Deputy Administrator Decision, Feb. 15, 1980, CCH pg. 9186, ¶ 30,333 and *St. Mary's of East St. Louis v. Blue Cross Association/Health Care Service Corp.*, HFCA Deputy Administrator Decision, Feb. 15, 1980 (not reported in CCH). In both cases, plaintiffs, nonprofit hospitals, made a substantive attack on the validity of regulation 405.429 and its profit–nonprofit distinction. In both cases the Provider Reimbursement Review Board found the regulation invalid and held that nonprofit provid-

ers were entitled to a return on equity capital, just as if they were proprietary providers. In both instances, on appeal from the board, the deputy administrator reversed stating first that the board had exceeded its authority under 42 C.F.R. § 405.1867, which regulation requires the board to comply with Title XVIII of the Social Security Act and the regulations issued thereunder and does not authorize it to set aside existing regulations. More importantly, however, for our purposes, the deputy administrator stated that even if the board had not found § 405.429 to be "subordinate and not applicable, its decision is erroneous." *Indiana Hospital Association, Ibid.* at 9190. As stated by the deputy administrator:

> It would appear that if a return on equity capital were paid to non–profit hospitals, Medicare would be paying a disproportionate share of provider costs. This is because the return is a profit rather than a cost.

> \* \* \* \* \* \*

> Based on the specific wording of Section 1861(v)(1)(B) of the Act and 42 CFR 405.429, and the Congressional comments, the Deputy Administrator finds that a return on equity capital is not an element of reasonable cost for non–profit providers. *Id.* at 9191.

Thus, it is clear that the distinction drawn by regulation 405.429 is one which will be upheld by the agency's own interpretation, as well as by our interpretation.

Plaintiff relies incorrectly on *Diplomat Lakewood v. Harris* as standing for the proposition that the profit–nonprofit provider discrimination is arbitrary and capricious. That case did not address such a distinction but rather struck down a regulation which drew a distinction between *large* and *small* providers. The court of appeals concluded that such a distinction had no rational basis related to the purposes of the enabling legislation. Thus, *Diplomat Lakewood, Inc.*, is of no relevance to the case at hand.

Thus, we conclude that while § 405.-419(c)(1) and § 405.429 do draw a distinction

between profit and nonprofit providers and provide some benefit to the former but none to the latter, we find such distinction rational and reasonably related to the purposes of the Medicare Act. This special dispensation for profit–providers in no way changes the application of § 405.419(c)(1) to nonprofit providers. The conclusion of the hearing officer that plaintiff is to be denied and reimbursement for interest on loans from a related party must be and is upheld.

We note, as a final point of emphasis, the prophylactic nature and purpose of 20 C.F.R. § 405.427 and 20 C.F.R. § 405.-419(c)(1) and reiterate our readiness to sustain that purpose against such challenges as plaintiff makes here. If they do injustice to any nonprofit providers, we do not think plaintiff has shown itself to be in that category, though its good faith is not questioned. We also note that we do not stand alone in our readiness. *See Hillside Community Hospital of Ukiah v. Mathews, supra; Caylor–Nickel Hospital, Inc. v. Secretary of HEW,* Civil No. F77–83 (N.D.Ind. 1979); and *Chelsea Community Hospital v. Michigan Blue Cross,* 436 F.Supp. 1050 (E.D. Mich.1977).

III. *Derivative cost under 20 C.F.R. § 405.428.*

This is a 2 percent add–on to allowable cost as granted by 20 C.F.R. § 405.428 for certain years. Had we allowed the claimed depreciation allowance and interest expense, the 2 percent adjustment would be ministerial. Since we uphold the hearing officer's decision, there is no adjustment.

CONCLUSION

Defendant's cross–motion for a summary judgment is granted, plaintiff's motion for summary judgment is denied, and the petition is dismissed.