VALLEY VIEW COMMUNITY HOSPITAL, a nonprofit corporation; and National Accommodations, Inc., a corporation

v.

The UNITED STATES.

No. 126–80C.

United States Court of Claims.

May 19, 1982.

---

Patric Hooper, Los Angeles, Cal., attorney of record, for plaintiff. Weissburg & Aronson, Inc., Los Angeles, Cal., of counsel.

Benjamin F. Wilson, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Virginia I. Bell, Washington, D. C., attorney of record. Evelyn W. Bradford, Dept. of Health and Human Services, Los Angeles, Cal., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG * and BENNETT, JJ.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

In this Medicare case the plaintiffs, Valley View Community Hospital ("Valley View")[1] and the entity that owned its facil-

ities, National Accommodations, Inc. ("National"),[2] challenge the refusal of the Medicare intermediary, Blue Cross Association ("Blue Cross"), either to reimburse Valley View for the rent it paid to National or to include within the lesser reimbursement allowed a return on National's equity in Valley View.[3] The claim covers the years 1970, 1971, and 1972. The case originally was filed in the United States District Court for the District of Arizona, which transferred it to this court. Both parties have moved for summary judgment. We grant the defendant's motion and dismiss the petition.

I.

A. Valley View has been a nonprofit hospital in Arizona since 1966. By 1969, Valley View was experiencing severe cashflow problems. The problems in substantial part arose because more than 90 percent of Valley View's patients were Medicare patients, and it took considerable time for the government to reimburse Medicare providers. Attempts by Valley View to alleviate its financial problems by raising additional capital were unsuccessful.

Valley View then conducted extensive negotiations with National, a for-profit corporation that owns and operates hospitals and nursing homes. The negotiations resulted in three related agreements, which the parties executed simultaneously on November 21, 1969.

1. National purchased all of Valley View's physical assets, including land, building, and equipment, for $602,834, assumed Valley View's liabilities of $100,000, and agreed to lend Valley View $200,000 for operating expenses at the prevailing bank rate of interest.

---

* Before his death, Judge Kunzig participated in the oral argument in, and agreed with the disposition of, this case.

1. Prior to its agreement with National, Valley View was known as Mountain View Pioneer Hospital. Both are hereinafter referred to as "Valley View."

2. Eldercare Centers, Inc., was National's predecessor. Both are hereinafter referred to as "National."

3. Blue Cross Association acts as fiscal intermediary of the Secretary of Health, Education and Welfare pursuant to 42 U.S.C. § 1395a (1970 ed.). At all times relevant, Blue Cross Association delegated its function as fiscal intermediary in Arizona to Blue Cross of Arizona. Blue Cross of Arizona made the initial determination whether to reimburse Valley View. That decision was appealable to a hearing officer of Blue Cross Association. Because the distinction between Blue Cross Association and Blue Cross of Arizona is irrelevant to our determination of this case, we use "Blue Cross" to refer to both.

2. Valley View leased back the land, building, and equipment from National for 25 years. The rental was $10,000 per month, and Valley View also agreed to pay all taxes, insurance premiums, utilities, and maintenance for the facility.

3. Valley View entered into a management agreement with National. The management agreement provided: (1) that its term was the same as the term of Valley View's lease of the hospital; (2) that National would have sole and exclusive power to operate and manage the hospital and to hire and fire, as well as to set the compensation of, the hospital's employees, subject to approval of the annual budget by Valley View's board of directors; (3) that Valley View would conform its accounting system to that of National; (4) that National would hire a resident administrator to operate and manage the hospital, whose appointment would be subject to the approval of Valley View's board and whose actions would be subject to National's approval; and (5) that Valley View would reimburse National for the salary and normal business expense of the administrator and pay National $25 per month per licensed bed (an amount subject to change), to cover Valley View's proportionate share of National's overhead expense.

The three agreements were negotiated together and signed the same day. The purchase and sale agreement provided for the leaseback of the hospital and stated the terms thereof. National also agreed in that agreement to "provide supervisory management for seller's operation of the hospital from and after the closing of this transaction," for which Valley View was to reimburse National "on an actual cost basis."

B. As a provider of Medicare services, which had entered into an agreement with the Secretary of Health, Education and Welfare (now, the Secretary of Health and Human Services) (the "Secretary") pursu-ant to 42 U.S.C. § 1395cc (1970 ed.),[4] Valley View was entitled to reimbursement for its reasonable costs incurred in providing hospital services to Medicare patients. 42 U.S.C. § 1395x(v). Pursuant to 42 U.S.C. § 1395h, Blue Cross was Valley View's fiscal intermediary, and therefore was responsible for determining the reasonable costs for which Valley View was entitled to reimbursement under Medicare.

In its cost report for 1970, filed with Blue Cross pursuant to 20 C.F.R. § 405.453(f) (1973),[5] one of the items for which Valley View sought reimbursement was the $120,000 rent it paid in that year to National. Although a provider is entitled generally to reimbursement for its rental expense as part of its costs (see 20 C.F.R. § 405.402), when an organization "related to the provider" supplies the facility and receives the rent (20 C.F.R. § 405.427), the provider is reimbursed "at the cost to the related organization." Id. at § 405.427(a).

Blue Cross ruled that Valley View and National were related organizations, and that Valley View therefore was entitled to reimbursement only for National's cost of ownership of the hospital facilities and not for the rent Valley View paid to National. Blue Cross awarded Valley View as National's cost $90,808, consisting of National's depreciation and interest expenses of $51,607 and its administrative costs of $39,201.

On appeal by Valley View and National, the Blue Cross appeals hearing officer upheld the reduction of reimbursement. In the appeal, Valley View and National not only challenged the determination that they were related organizations, but further contended that even if they were such organizations, Valley View was entitled to receive, as a cost of National, a return on National's equity in the hospital. The hearing officer stated that the provider had "conceded" the correctness of Blue Cross' substitution of

---

4. All subsequent citations to the United States Code are to the 1970 edition unless otherwise indicated.

5. At the time this dispute arose, the relevant regulations were located in Title 20 of the Code of Federal Regulations. They now are located in Title 42. Unless otherwise indicated, all subsequent citations will be to the 1973 edition of Title 20 of the C.F.R.

National's cost for the rent specified in the lease. His opinion discussed only the claim that National's cost should include a return on its equity in the hospital, and he rejected that contention.

C. Blue Cross similarly disallowed the rental expense in Valley View's cost reports for 1971 and 1972, and substituted National's cost of ownership, excluding a return on National's investment in the facility. The plaintiffs did not appeal to the intermediary hearing officer the initial determinations for those years.

D. In the present suit, Valley View and National seek to recover for 1970, 1971, and 1972, either the difference between the rent Valley View paid and the "ownership costs" Blue Cross allowed, or an amount in addition to the ownership costs reflecting a return on National's equity in the hospital.

## II.

Before reaching the merits of the plaintiffs' claims, we address two of the government's preliminary defenses.

■ A. The government urges that National should be dismissed from the suit since it is not a Medicare provider but only a supplier of a Medicare provider. The regulations provide, however, that "any . . . entity found by the intermediary to be a related organization of [the] provider" under 42 C.F.R. § 405.427 (1980), is a proper party to the "intermediary's determination of the amount of . . . reimbursement." 42 C.F.R. § 405.1805 (1980). The intermediary (Blue Cross) found that National was a related organization of the provider (Valley View). Under the regulation, National therefore was a proper party to the administrative proceedings before Blue Cross and participated in those proceedings. As such, it has standing to challenge here Blue Cross' reduction of the reimbursement to which Valley View is entitled—a reduction that is likely to affect it adversely as the owner of Valley View's facilities. *Cf. International Union, United Automobile Workers v. Scofield*, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965).

B. The government argues that we should dismiss the part of the plaintiffs' claim that relates to 1971 and 1972. The government points out that the plaintiffs failed to appeal Blue Cross' adjustments in Valley View's cost reports for those years to the intermediary hearing officer, as 42 C.F.R. § 405.1809 (1980) required. It argues that failure to exhaust administrative remedies bars the plaintiffs from litigating the claims for those years.

■ Since we uphold Blue Cross' determination for 1970, and since the claims for 1971 and 1972 involve the identical issues, our decision on the 1970 claims also governs the 1971 and 1972 claims and compels their rejection. We therefore need not decide whether the plaintiffs' failure to exhaust their administrative remedies for the 1971 and 1972 claims bars the plaintiffs from asserting those claims in this court.

## III.

Section 1395f(b) of Title 42 states that providers of Medicare services shall be paid "the reasonable cost of such services, as determined under section 1395x(v) of this title." Section 1395x(v)(1) provides, in part:

The reasonable cost of any services shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included . . . . Such regulations shall (A) take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs. . . .

This provision gives the Secretary broad discretion to determine, by regulation, both what is a "cost" and what is "reasonable." *See Pasadena Hospital Association, Ltd. v. United States*, 223 Ct.Cl. 72, 81–82, 618 F.2d 728, 732–33 (1980).

Pursuant to this authority, the Secretary promulgated subpart D of the Medicare

regulations. 20 C.F.R. § 405.400 *et seq.* Section 405.427 of those regulations, entitled "Cost to related organizations," states, in part:

(a) *Principle.* Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) *Definitions*—(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

\*    \*    \*    \*    \*    \*

(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

This regulation, which limits the reimbursable cost of services, facilities, and supplies that a related organization furnishes to the provider to the costs of the supplying organization, is a valid implementation of the Secretary's statutory authority to define "cost" under the statute. *See Pasadena Hospital Association, Ltd.,* 223 Ct.Cl. at 81–82, 618 F.2d at 732–33. The limitation to the costs of the related organization "serves to screen out both costs not actually incurred and unreasonable costs. That is to say, the regulation precludes reimbursement for cost increases due solely to transactions between different parts of a single economic unit, and it polices 'sweetheart' contracts with suppliers that may inflate costs to the provider." *Medical Center of Independence v. Harris,* 628 F.2d 1113, 1119 (8th Cir. 1980) (footnotes omitted). The limitation also reduces administrative costs and the potential for administrative error by eliminating the need for the Secretary to scrutinize every transaction between a Medicare provider and its related supplier in order to determine whether the charges are reasonable. *See Stevens Park Osteopathic Hospital, Inc. v. United States,* 225 Ct.Cl. ——, ——, 633 F.2d 1373, 1379 (1980); *Pasadena Hospital Association,* 223 Ct.Cl. at 82, 618 F.2d at 733.

In the Provider Reimbursement Manual, HIM–15 § 1004.3, the Secretary has interpreted the control provision of section 405.-427 of the regulation. The Manual provision states:

The term "control" includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise.

The facts and circumstances in each case must be examined to ascertain whether legal or effective control does, in fact, exist. Since a determination reached in a specific case represents a conclusion based on the entire body of facts and circumstances involved, such determination should not be used as a precedent in other cases unless the facts and circumstances are substantially the same.

In limiting Valley View's reimbursement for rental paid to National to the ownership cost of the hospital facility, Blue Cross acted pursuant to section 405.427 of the regulations. The plaintiffs contend that Blue Cross misapplied the regulation. They challenge Blue Cross' determination that they were related organizations. Although conceding that they became such organizations upon the signing of the management agreement on November 21, 1969, which they recognize gave National control over Valley View, the plaintiffs argue that they were not related during the preceding period when the terms of the lease were negotiated. They urge that the limitation in section 405.427 that the cost of a related supplier rather than the cost of the provider governs, therefore is inapplicable to the rent Valley View paid in 1970 to its related organization, National.

We think that the plaintiffs have read the related organization provisions of the regulation too narrowly. As indicated, the purpose of those regulations is prophylactic. The fiscal intermediaries necessarily have considerable discretion in applying them in order to effectuate their purpose of avoiding possible overreaching and manipulation of cost items in dealings between organizations where the ownership or control of the provider by another gives the latter the ability to structure the transaction in a way it could not do if it were dealing with a wholly independent entity.

Although National did not control Valley View when the two entities entered into negotiations for the sale of the hospital facilities, the leaseback of them and the assumption and control by National of Valley View's operations through the management agreement, the three agreements were negotiated together. The terms of each were determined in conjunction with and in relation to the terms of the other two. The three agreements were interdependent, and the parties' concurrence in the terms of any one was dependent upon the terms of the others. Indeed, as previously noted, the purchase and sale agreement provided for the leaseback and the management contract.

The plaintiffs must have been aware that once the management contract became effective, National would be in control of Valley View, and that once that control existed, Blue Cross, pursuant to section 405.427, would reimburse Valley View only for National's cost of rendering the management services to Valley View. In fact, the management contract provided for payment on a cost basis.

National's ability to maximize its profits from its arrangements with Valley View thus depended upon the amount of rent it would receive from Valley View for which Blue Cross would reimburse Valley View. The parties may have concluded that there was substantial likelihood that Blue Cross would allow the rent specified in the lease, on the theory that National and Valley View were not related when the rent was negotiated. To the extent that the arrangements between National and Valley View would result in greater reimbursement of Valley View by Medicare, both parties would gain. The arrangements with National would cost Valley View less; National would strengthen the financial position of its customer and lessee; and Valley View would be able to pay National a greater amount under the arrangements between them.

In negotiating the three agreements, therefore, National had an incentive to increase the rent Valley View would pay it and thus to recoup any profits it was required to forego under the management contract because it would charge only cost for its management services. Valley View, in turn, would be likely to agree to a higher rent which, because the charge under the management contract would be at cost, would not increase its total payments to National. The effect of this accommodation, however, would be to increase the portion of Valley View's expenses that Medicare would subsidize, which would be inconsistent with the directive in section 1395x(v)(1) that the costs of non-Medicare patients "will not be borne" by the Medicare program.

Although National and Valley View may have been independent entities when their discussions began, as the deal between them took shape during the negotiations, National had virtually the same power to structure the final arrangements to its liking as any other entity that controls a provider of Medicare services. The fact that both parties knew that any arrangements between National and Valley View would cover all three aspects of the transaction entered into—and Valley View needed some arrangement to extricate itself from its serious financial predicament—gave National added leverage in structuring its arrangements with Valley View.

By the time the negotiations had concluded and the terms of the three agreements had been reached, National realistically was an entity that controlled Valley View within the meaning of the regulation. As we

stated in *Robishaw v. United States*, 222 Ct.Cl. 474, ——, 616 F.2d 507, 515 (1980), which presented a similar question involving the application of section 1239 of the Internal Revenue Code of 1954 governing sales by an 80 percent stockholder to his company, "the significant thing is the relationship existing when the negotiations are in progress and an agreement is reached, rather than the relationship existing after the consummation of the transaction."

The plaintiffs assert that the Blue Cross determination violated a provision of the Provider Reimbursement Manual, HIM–15 § 110(A), which states:

> Rental costs specified in sale and leaseback agreements incurred by providers through selling plant facilities or equipment to a purchaser not connected with or related to the provider and concurrently leasing back the same facilities or equipment are includable in the allowable costs if

specified conditions are met.

HIM–15 § 110(A) interprets not the related organization provisions of the regulations, but the provisions governing depreciation. Moreover, it merely indicates the conditions under which rental charges resulting from a sale and leaseback between unrelated organizations will be reimbursed. It sheds no light on the question in this case, which is whether National and Valley View were related organizations when the rent in the lease was determined.

The Provider Reimbursement Manual requires the fiscal intermediary to examine "[t]he facts and circumstances in each case . . . to ascertain whether legal or effective control does, in fact, exist." HIM–15 § 1004.3. Under the limited scope of our review of determinations of fiscal intermediaries in Medicare cases, we cannot overturn the determination by Blue Cross that, under the facts of this case, Valley View and National were related organizations. We may review that determination only "insofar as such determination (a) may have involved or rested upon procedures which were constitutionally invalid or violative of the governing statute, or (b) may have sub-

stantially violated the Due Process Clause of the Fifth Amendment or the provisions of the governing statute." *Goldstein v. United States*, 201 Ct.Cl. 888, 889 (1973), *cert. denied*, 414 U.S. 974, 94 S.Ct. 287, 38 L.Ed.2d 217 (1973); *see also West Seattle General Hospital, Inc. v. United States*, 674 F.2d 899 at 905 (Ct.Cl.1982). Under that standard, we have no basis for rejecting the determination by Blue Cross that Valley View may be reimbursed only for National's cost of providing the hospital facilities to Valley View and not for the rent paid under the lease.

Our holding rests upon the particular facts of this case—the simultaneous negotiation of the three agreements, their close interrelationship and interdependency, the need of Valley View to enter into some financial arrangements because of its financial difficulties, and the opportunities for manipulation that were present in the situation. We do not intimate that such manipulation or overreaching actually took place but state only that there was opportunity and motive for it. We adopt the admonition in HIM–15 § 1004.3 of the Provider Manual that "[s]ince a determination reached in a specific case represents a conclusion based on the entire body of facts and circumstances involved, such determination should not be used as a precedent in other cases unless the facts and circumstances are substantially the same."

IV.

A. Alternatively, the plaintiffs contend that even if Blue Cross properly limited Valley View's rental claim to the cost to National of furnishing the hospital facilities, that cost should have included a return on National's equity in the facility. The plaintiffs note that section 405.427(c)(2) states that "reimbursable cost should include the costs for . . . items [supplied by a related entity] at the cost to the supplying organization," and urge that one of National's costs of ownership as a profit-making entity was a return on its equity investment in Valley View's facilities.

The Secretary's regulations interpreting reasonable costs distinguish between profit and nonprofit providers and permit reimbursement of a return on equity only for the former but not for the latter category.

Section 1395x(v)(1)(B) provides that "in the case of extended care services furnished by proprietary facilities," reimbursable costs shall include "a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services." Section 405.429 of the Medicare regulations makes this provision applicable to all proprietary providers. The regulation, however, states that "the term 'proprietary providers' is intended to distinguish providers ... that are organized and operated with the expectation of earning profit for the owners, from other providers that are organized and operated on a nonprofit basis." The regulation gives the following explanation for limiting reimbursement for return on equity capital to proprietary providers:

(b) *Application.* Proprietary providers generally do not receive public contributions and assistance of Federal and other governmental programs such as Hill-Burton in financing capital expenditures. Proprietary institutions historically have financed capital expenditures through funds invested by owners in the expectation of earning a return. A return on investment, therefore, is needed to avoid withdrawal of capital and to attract additional capital needed for expansion.

Nonprofit providers do not require reimbursement for a return on equity because government funds and private contributions, not profits, are their source of capital, and therefore they do not need to make a profit to obtain and retain capital. This approach is consistent with the legislative history. *See Stevens Park Osteopathic Hospital*, 225 Ct.Cl. at ——, 633 F.2d at 1382–83 (quoting the Committee on Finance Staff Report).

The Secretary's interpretation of section 405.427 contained in the Provider Reimbursement Manual confirms that Valley View, as a nonprofit provider, is not entitled to reimbursement for a return on National's equity investment in the hospital. HIM–15 § 1006, entitled "Rental Expense Paid to a Related Organization," explains that where a provider leases a facility from a related organization, the rent it pays "is not allowable as cost" but the provider "would include in its costs the costs of ownership of the facility.... The effect is to treat the facility as though it were owned by the provider."

Another provision of the Manual (to which HIM–15 § 1006 refers), HIM–15 § 1212 captioned "Assets Leased from Related Organizations," states:

Generally, reimbursement to any provider leasing facilities or equipment from a "related organization" is limited to the costs of ownership of the leased facilities (depreciation, taxes, interest expenses, etc.) in accordance with Chapter 10 of this manual, just as though the provider owned the facilities. Therefore, the owners' equity in the leased assets is includable in the equity capital of a proprietary provider.

If Valley View owned the facility, as a nonprofit provider it would not be entitled to "the cost of capital." *See Stevens Park Osteopathic Hospital*, 225 Ct.Cl. at ——, 633 F.2d at 1383. The fact that the related organization, National, is a profit-making institution does not require a contrary conclusion. Although the related organization provisions of the regulation generally provide that the provider is entitled to reimbursement for the costs of its related supplier, the regulations and the Manual qualify that provision by providing that a rented facility is treated as if the provider owned it and that only profit-making providers are entitled to a return on equity.

Nothing in the statute, regulations, or the Manual indicates that a nonprofit provider that leases facilities from a related profit-making organization is entitled to be reimbursed for the related entity's return on its investment. The nonprofit provider neither needs nor expects to recover this element of its supplier's cost. Indeed, to allow the provider reimbursement for this item would

enable it to avoid the prohibition in the regulation that only proprietary providers may be reimbursed for a return on their capital investment in the property. In contrast, the limitation embodied in HIM–15 §§ 1006 and 1212 furthers the purposes of the Medicare statute by preventing the Medicare program from funding nonexistent expenses of providers and thereby from bearing "the costs with respect to individuals not ... covered" by Medicare. 42 U.S.C. § 1395x(v)(1)(A).

Blue Cross' refusal to reimburse Valley View, a nonprofit provider, for the cost of National's capital invested in the hospital did not violate the statute or the regulations.

B. The plaintiffs also argue that even if they are related persons, under *Richlands Medical Association v. Harris,* 651 F.2d 931 (4th Cir. 1981), Valley View is entitled to reimbursement for the rent it paid to National. In *Richlands,* a lease of the hospital facilities was made in 1961; Blue Cross found that the hospital became a related organization of the lessors in 1968 when one of the lessors became the administrator of the hospital. For 1975, the Secretary reimbursed the hospital only for the lessor's cost of ownership, not the rent in the lease. The court of appeals reversed, holding that the proper reimbursement was the rent established before 1968, which it concluded "was fixed as a result of arms-length bargaining," increased to reflect inflation since that time. 651 F.2d at 936.

*Richlands* was decided under the 1973 amendment to the Act, which provides for review of Medicare cost reimbursement determinations under a broader standard than we use, namely, whether "the Secretary's findings and conclusions are supported by substantial evidence and are not arbitrary, capricious or otherwise contrary to law." 651 F.2d at 934; 42 U.S.C. § 1395oo(f)(1) (1976). Moreover, the rationale of the court's decision was that the supplier and the provider were not related organizations when the rent was set initially. In the present case, in contrast, we have upheld Blue Cross' determination that National

and Valley View were related organizations when they agreed upon the rent. *Richlands* thus involved a critically different factual situation and therefore is not a persuasive precedent for deciding the present case.

### CONCLUSION

The defendant's motion for summary judgment is granted, and the plaintiffs' motion is denied. The petition is dismissed.