INDIANA HOSPITAL ASSOCIATION, INC., Plaintiff,

v.

Richard S. SCHWEIKER, Secretary, Department of Health and Human Services, John A. Svahn, Commissioner of Social Security, Defendants.

ST. FRANCIS HOSPITAL CENTER, et al.

v.

Richard S. SCHWEIKER, Secretary Department of Health and Human Services, Provider Reimbursement Review Board, Thomas Tierney, Chairman, Defendants.

Nos. IP 76–522–C, IP 80–89–C, IP 80–206–C, IP 80–272–C and IP 80–500–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Aug. 12, 1982.

Geoffrey Segar, William S. Hall, Indianapolis, Ind., for plaintiff.

Sarah Evans Barker, U. S. Atty., Bradley L. Williams, Asst. U. S. Atty., Indianapolis, Ind., Jeanne Schulte Scott, Atty., Dept. of HHS, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION

DILLIN, Chief Judge.

These cases come before the Court on a variety of motions. The original plaintiff, Indiana Hospital Association, Inc., has moved for partial summary judgment as to Cause No. IP 76–522–C. The defendants have moved to dismiss No. IP 76–522–C, claiming that the Court lacks jurisdiction over the subject matter of that suit. The plaintiffs and the defendants of the four consolidated suits have moved for summary judgment. In accordance with the reasons which follow, the Court will dismiss the Hospital Association suit, No. IP 76–522–C, for lack of subject matter jurisdiction, and enter summary judgment for the defendants on the merits in the four consolidated cases, Nos. IP 80–272–C, IP 80–500–C and IP 76–522–C insofar as it encompasses former Nos. IP 80–89–C and IP 80–206–C.

The facts and legal issues presented by these cases are complex and will be dealt with in greater detail in the body of this memorandum. In brief, these suits present challenges to Medicare reimbursement statutes, regulations and policies by 68 Indiana hospitals and the Indiana Hospital Association, Inc., to which the 68 hospitals belong.

The hospitals claim that they are entitled to reimbursement of the portion of their return on equity capital and bad debt and charity costs that they claim are attributable to the Medicare patients they treat. The Medicare Act was passed in 1965. 42 U.S.C. §§ 1395 *et seq.* It provides for the reimbursement of the reasonable cost of providing services to Medicare beneficiaries. 42 U.S.C. § 1395f(b). The statutory definition of "reasonable cost" is found at 42 U.S.C. § 1395x(v)(1)(A). Pursuant to the Medicare Act, the Secretary of Health and Human Services (hereinafter "the Secretary") has promulgated regulations which define the concept of reasonable cost more fully. 42 U.S.C. § 1395hh; and 42 C.F.R. §§ 405.401–405.488.

The 68 plaintiff hospitals have all made claims for reimbursement for return on equity capital and bad debt and charity costs for a variety of fiscal years with the "fiscal intermediary" which acts as the agent of the Secretary pursuant to 42 C.F.R. § 405.651. The fiscal intermediary which rules upon claims made by Indiana hospitals (termed "providers" under the Act) is Mutual Hospital Insurance, Inc. d/b/a Blue Cross of Indiana.

These plaintiffs filed claims ("Cost Reports") with Blue Cross. Blue Cross, by "Notices of Program Reimbursement" to each of the hospitals, denied payment under the Medicare Act for the return on equity, bad debt and charity claims. The hospitals then pursued the administrative appeals outlined by the Act and the Secretary's regulations. 42 U.S.C. § 1395oo (a); and 42 C.F.R. § 405.1837. The plaintiffs were granted permission to pursue their appeals as a group appeal, since their claims presented common questions of law.

The first level of appeal was to the Provider Reimbursement Review Board ("PRRB" or "Board" hereafter). The PRRB ruled that the hospitals were entitled to a return on equity, but sustained Blue Cross's denial of reimbursement for the bad debt and charity costs.

The Deputy Administrator of the Health Care Financing Administration, to whom the Secretary's power to review the PRRB's decisions has been delegated, reversed the

Board's findings in regard to the return on equity issue and affirmed the decision to deny reimbursement of bad debt and charity costs.

The hospitals filed suit in district courts for judicial review of this decision. The original Hospital Association suit, No. IP 76–522–C, which in essence asks for declaratory and injunctive relief for these same two issues, was in this court. Therefore, the other four cases representing a request for review of the administrative decision were sent to this Court for consolidation. The Court will treat the following major issues in this memorandum: (1) subject matter jurisdiction, (2) venue, (3) return on equity capital, and (4) bad debts and charity.

## Discussion

### (1) Subject Matter Jurisdiction

The defendants have moved to dismiss IP 76–522–C, the Hospital Association suit, for lack of subject matter jurisdiction. The plaintiff claims that the Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337, 1361, 2201 and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* The defendants in the other cases have not challenged the power of the Court to review the Secretary's decisions under 42 U.S.C. § 1395*oo* (f)(1). Jurisdiction over all of these cases except the Hospital Association suit does lie by virtue of this section, which provides, in pertinent part:

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commencing within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. . . .

Therefore, the only question to be determined now is whether the Hospital Association suit, which requests declaratory relief, falls within some jurisdictional grant. This area of federal subject matter jurisdiction has been murky for years, so it is necessary to present a brief historical overview.

Plaintiffs have tried a variety of statutory pathways to get judicial review of decisions made or positions taken by the PRRB or by HHS. Until recently the most successful was 28 U.S.C. § 1331. In 1975, however, the Supreme Court announced its decision in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522, which, read with later interpretive cases, prohibits a finding of jurisdiction over the Hospital Association case.

The critical section discussed in *Salfi, supra,* is § 205(h) of the Social Security Act (42 U.S.C. § 405(h)), which provides that:

The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under Section 41 of Title 28 [which includes 28 U.S.C. § 1331] to recover on any claim arising under this subchapter.

Section 405(h) is expressly incorporated into the Medicare Act by 42 U.S.C. § 1395ii, which states that the section applies to the "same extent" as it is applicable with respect to Title II of the Act.

*Salfi* dealt with a Social Security benefit entitlement requirement. The Supreme Court held that the language of the third sentence of 42 U.S.C. § 405(h) barred § 1331 jurisdiction of a constitutional challenge to the Social Security requirement. *See Trinity Memorial Hospital of Cudahy, Inc. v. Associated Hospital Services,* 570 F.2d 660, 664 (7 Cir. 1977). The plaintiffs have attempted to avoid the bar of *Salfi* by stressing the differences between the Social Security and Medicare systems, but the Seventh Circuit has applied *Salfi* expansive-

ly in both provider reimbursement disputes (*Trinity, supra*) and to a case of termination of a provider agreement (*Northlake Community Hospital v. United States*, 654 F.2d 1234, 1240 (7 Cir. 1981)).

The most important point decided by the Supreme Court in *Salfi*, for the purposes of this discussion, is "[t]hat the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion." *Id.*, 422 U.S. at 757, 95 S.Ct. at 2462, 45 L.Ed.2d at 534. The Court noted that the "sweeping and direct" language of this third sentence "states that *no* action [Court's emphasis] shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted." *Id.* According to the Court, the first two sentences of § 405(h) require exhaustion of administrative remedies, so the third sentence must mean something more if it is not to be rendered superfluous.

The Supreme Court then stated that the fact that the *Salfi* plaintiffs were raising constitutional issues did not mean that the action did not arise under the Social Security Act. "To contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and substance of the complaint and judgment." *Id.*, 422 U.S. at 761, 95 S.Ct. at 2464, 45 L.Ed.2d at 536.

The plaintiff contends that its case should be heard because: (1) it presents constitutional challenges, and/or (2) its claims are outside the scope of *Salfi* because there is no administrative procedure under Medicare comparable to that which exists for challenges to the Social Security program.

The plaintiff insinuates that if the Court does not have jurisdiction over its claims, they will be bereft of judicial review. This position is incorrect. The same legal questions posed in the form of disputed claims for reimbursement (as opposed to this request for equitable relief) are now consolidated with the Hospital Association suit. The plaintiff hospitals in the consolidated suits have presented their arguments to the appropriate officials as they ran the course of prescribed administrative procedure. They have complied with the requirements of *Salfi* and therefore, fall within the jurisdictional grant of 42 U.S.C. § 1395oo.

The Seventh Circuit has held that "*Salfi* 'precludes the use of 28 U.S.C. § 1331 as a jurisdictional basis' for Medicare provider reimbursement disputes." *Northlake Community Hospital v. United States*, 654 F.2d 1234, at 1240 (7 Cir. 1981), quoting *Cudahy, supra*. The plaintiff attempts to avoid this ruling by stating that it, as an association of providers, is not a provider per se and therefore, is not subject to the administrative review process. It stresses that it is not seeking to recover on a claim, but is asking for a ruling on the legality of the Act and regulations promulgated thereunder.

This argument, however, is similar to the contention rejected in *Salfi*: it is an attempt to evade the § 405(h) ban by recharacterization. In essence, this suit was brought in order to have regulations declared void so that the plaintiff's member hospitals could recover more Medicare expenses. The Hospital Association suit is, in fact if not in form, an action on a claim arising under the Medicare Act and as such, is within the ban of § 405(h).

The plaintiff's more substantial argument is that even if § 405(h) is applicable, there is still jurisdiction because the Medicare Act contains no provisions for judicial review of the constitutionality of either the statute or of the Secretary's regulations. The plaintiff argues that the Supreme Court surely did not intend that the *Salfi* decision preclude nonstatutory review in cases in which the Act does not provide a review mechanism. In support of its position, the plaintiff points to the *Salfi* Court's treatment of *Johnson v. Robinson*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

The Court in *Salfi* noted that in *Johnson* it considered 38 U.S.C. § 211(a) which provides:

[T]he decisions of the [Veterans'] Administration on any question of law or fact under any law administered by the Veter-

ans' Administration providing benefits for veterans ... shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise. *Salfi, supra,* 422 U.S. at 761, 95 S.Ct. at 2464, 45 L.Ed.2d at 536.

The *Johnson* Court found that the provision did not preclude an attack on the constitutionality of a statutory limitation in that such limitation was not a "decision" of the Administrator, but had been made by Congress. The Court found *Salfi* to be inapposite to the *Johnson* case for two main reasons. The Court first observed that the language of § 405(h) is quite different in that:

Its reach is not limited to decisions of the Secretary on issues of law or fact. Rather, it extends to any "action" seeking "to recover on any [Social Security] claim"— irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his nondiscretionary application of allegedly unconstitutional statutory restrictions. *Salfi, supra,* 422 U.S. at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 536.

The Court also found *Johnson* inapposite in that if § 211(a) precluded "constitutional challenges to statutory limitations then absolutely no judicial consideration of the issue would be available." The Court continued:

Not only would such a restriction have been extraordinary, such that "clear and convincing" evidence would be required before we would ascribe such intent to Congress ... but it would have raised a serious constitutional question of the validity of the statute as so construed. *Salfi, supra,* 422 U.S. at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 537.

The Court noted that this was not a problem in *Salfi* as the Social Security Act, pursuant to § 405(g), provided for constitutional challenges to its provisions.

The plaintiff contends that this second difference is a problem in this case as no provision is made in the Medicare Act for judicial review of the constitutionality of the statute or the regulations promulgated thereunder.

■ In order to be reimbursed, a provider must submit a "cost report" to the fiscal intermediary. If the provider is dissatisfied with the intermediary's award, then it can have a hearing. The hearing officer, however, must "comply with all the provisions of Title XVIII of the [Medicare] Act and regulations issued thereunder." 20 C.F.R. § 405.1829.

Congress also established the PRRB in 1973. The Board has the authority to review many intermediary hearing decisions. 42 U.S.C. § 1395oo. It has the power to "affirm, modify or reverse a final determination of the fiscal intermediary with respect to a cost report ...." 42 U.S.C. § 1395oo (d). The Board, however, is to comply with the Act and regulations issued thereunder. 20 C.F.R. § 405.1867.

The PRRB's decision is final unless the Secretary, on his own motion and within 60 days after the provider is notified, "reverses, affirms or modifies the Board's decision." 42 U.S.C. § 1395oo(f)(1). The provider then has the right to obtain judicial review of any final decision of the Board or any affirmance, modification or reversal by the Secretary.

The plaintiff argues that since the fiscal intermediary and the Review Board are bound by the Act and the regulations, there is no mechanism for review of its challenge. This contention is analogous to one refuted in *Salfi.*

The administrative process considered by the Supreme Court in *Salfi* was equally incapable of giving the relief requested. *See Aristocrat South, Inc. v. Mathews,* 420 F.Supp. 23 (D.D.C.1976). Nevertheless, the Supreme Court held that resort to the administrative review process was required and that § 405(h) extended to "any 'action' seeking 'to recover on any [Social Security] claim'—irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his nondiscretionary application of allegedly

unconstitutional statutory restrictions." *Id.* 422 U.S. at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 536. The First Circuit has noted that the administrative process is not made "inapplicable by reason of a constitutional challenge, beyond the power of the Secretary to take remedial action." *Milo Community Hospital v. Weinberger*, 525 F.2d 144, 147 (1 Cir. 1975).

■ Remedial action is not even beyond the Secretary's power. The Secretary promulgated these challenged regulations: it is within his competence to provide the relief sought. The Court in *Salfi* stressed the importance of giving the Secretary an opportunity to review the claims made:

> [T]he Social Security Act itself provides jurisdiction for constitutional challenges to its provisions. Thus the plain words of the third sentence of § 405(h) do not preclude constitutional challenges. They simply require that they be brought under jurisdictional grants contained in the Act, and thus in conformity with the same standards which are applicable to non-constitutional claims arising under the Act. The result is not only of unquestionable constitutionality, but it is also manifestly reasonable, since it assures the Secretary the opportunity prior to constitutional litigation to ascertain, for example, that the particular claims involved are neither invalid for other reasons nor allowable under other provisions of the Social Security Act.

*Id.* 422 U.S. at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 537. The Medicare Act, pursuant to § 1395*oo*(f)(1), also provides the courts with jurisdiction over constitutional challenges to its provisions. The Secretary must have an opportunity to examine the provisions prior to such judicial review.

The Seventh Circuit discussed *Salfi* and its preclusionary effect in a case involving a constitutional challenge. *Trinity Memorial Hospital v. Associated Hospital Service, Inc.*, 570 F.2d 660 (7 Cir. 1977). It held that 42 U.S.C. § 405(h) precluded the use of 28 U.S.C. § 1331 as a jurisdictional basis over a due process challenge to a cost accounting hearing procedure. *Id.*, 570 F.2d at 667.

The court held, however, that jurisdiction over the constitutional issue would vest in the Court of Claims. *Id.*

■ Because of § 405(h), this Court has no jurisdiction under § 1331 to entertain the Hospital Association suit.

The alternative asserted bases for jurisdiction are equally inappropriate for the Hospital Association suit. The Supreme Court has held that 5 U.S.C. § 702 (§ 10(a) of the Administrative Procedure Act) does not represent a grant of jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ Title 28 U.S.C. § 2201, the declaratory judgment statute, does not provide the plaintiff with a separate jurisdictional basis. The declaratory judgment provision may not be used to evade a failure of jurisdiction or to avoid exhausting administrative remedies. *Hills v. Eisenhart*, 156 F.Supp. 902 (D.Cal.1957), *aff'd* 256 F.2d 609 (9 Cir. 1958), *cert. den.* 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958), *reh. den.* 358 U.S. 914, 79 S.Ct. 228, 3 L.Ed.2d 235 (1958).

■ The allegation that the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1337 is wholly unsupported. Section 1337 provides that:

> The district courts shall have original jurisdiction of any civil action or proceedings arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

Not only is there no authority for the proposition that the Social Security Act regulates commerce, jurisdiction may not be had under § 1337 because the plaintiff has not exhausted its administrative remedies.

■ Mandamus relief under 28 U.S.C. § 1361 is similarly unavailable. Mandamus is reserved for extraordinary situations and "lies only to compel the performance of a legal duty which is free from doubt." *Winningham v. HUD*, 512 F.2d 617 (5 Cir. 1975). The "clear, ministerial and nondiscretionary" duty which the plaintiff claims the defendants owe them is to pay the "reason-

able cost" of the services which they provide to Medicare patients. Neither the reasonable cost nor the duty to pay is free from doubt, so mandamus would be inappropriate. See *Trinity Memorial, supra,* 570 F.2d at 666, n.9.

The Hospital Association suit is therefore dismissed for want of subject matter jurisdiction. The other consolidated cases remain for consideration on the merits.

### (2) Venue

■ The defendants have claimed that venue is improper as to the plaintiffs which are located in the Northern District of Indiana. All four of the consolidated cases arose out of the administrative group appeal.

Cases No. IP 80–89–C and IP 80–272–C were filed originally in the Southern District. Cases No. IP 80–206–C and IP 80–500–C are parallel cases to the Southern District suits. They were first filed in the Northern District of Indiana, Hammond Division, as Nos. H 80–77 and H 80–218 and were transferred to this district by Judge McNagney in 1980, pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The question raised by the transfers is whether they are improper because they do not fall within the category of actions which "might have been brought" in the Southern District. The plaintiff list for each of these four cases is identical. Some of the plaintiff hospitals are located in the Northern District, others in the Southern. The defendants contend that claims of the Southern District plaintiffs could not have been brought originally in the Southern District and that therefore the transfers were wrongful. The defendants have moved either to have all four of these cases transferred to the District of Columbia, or for the Northern District plaintiffs' claims (as represented by Nos. IP 80–206–C and IP 80–500–C) to be returned to the Northern

District. The defendants base this claim on the venue provision which all parties agree is applicable, 42 U.S.C. § 1395oo(f)(1), which states, in pertinent part:

> Such action [to obtain judicial review over decisions by the PRRB or the Secretary] shall be brought in the district court of the United States for the judicial district in which the provider is located or in the District Court for the District of Columbia . . . .

The essence of the defendants' claims is that since some of the plaintiffs are located in the Northern District, they do not meet the requirement of § 1395oo(f)(1) that actions must be brought in the "judicial district in which the provider is located." Therefore, they assert that 28 U.S.C. § 1404(a), the transfer of venue statute, does not authorize a transfer to this court.

A critical issue which has not been treated by the parties is one of whether, in enacting § 1395oo(f)(1), Congress considered the issue of cases which had been consolidated for purposes of the administrative appeals. The defendants, pursuant to the Secretary's regulation 42 C.F.R. § 405.-1837, allowed these plaintiffs to pursue their claims through the entire administrative process as one case.

Now the government, based upon the venue statutes, asserts that the plaintiffs may not proceed with their claims in the group which the defendants allowed before.

It is obvious that the Congress, in enacting § 1395oo(f)(1), did not anticipate the possibilities of group appeals pursuant to the regulations. 42 C.F.R. § 405.1837. Rather than invalidating the regulation which promotes the efficient use of scanty administrative resources in the resolution of disputes of this kind, it is more appropriate for this Court to construe the language of § 1395oo(f)(1) to accomplish the result Congress would most likely wish to achieve if it were to consider this problem.

This was a group appeal throughout the administrative appellate process. The same issues are presented now for judicial review. It is most sensible to construe the

singular term "provider" in § 1395oo(f)(1) loosely, to encompass the entire group. Therefore, since many of the group members are located in the Southern District, the group could have brought suit here. The transfers of venue under 28 U.S.C. § 1404(a) were appropriate.

As a practical matter, it would be a waste of judicial resources to send roughly half of these plaintiffs to the Northern District. The consolidated suit is ripe for a decision on the merits. There is no reason, given chronically crowded court dockets, to have another district court in the Seventh Circuit wrestle with these issues. If an appeal is to be made, the Seventh Circuit can render its decision on the basis of this memorandum of decision. Therefore, the defendants' motions relating to severance and venue are denied.

### (3) Return on Equity Capital

The return on equity issue has been raised in several other courts. The hospitals' basic contention is that they should be reimbursed by the Medicare program for a reasonable rate of return on their net assets used in the treatment of Medicare patients. The plaintiffs rest their argument on the following grounds: (A) the Deputy Administrator had no power to reverse the PRRB's decision to grant these plaintiffs return on equity costs, therefore the PRRB's decision is final, (B) great deference should be given to PRRB's decision, (C) a return on equity is a "reasonable cost" of providing services under 42 U.S.C. § 1395x(v)(1)(A), (D) the denial of reimbursement for these costs constitutes a violation of the just compensation clause of the Fifth Amendment, and (E) since proprietary (for-profit) hospitals are given a return on net assets reimbursement, these plaintiffs, nonproprietary hospitals, are being denied their rights to equal protection.

In order to understand the plaintiffs' arguments, it is necessary to review some background and legislative history of the Medicare program. The terms "return on equity," "return on equity capital," "return on net assets," and "imputed interest" are all used to describe the hospitals' claims of entitlement to reimbursement for the opportunity cost of capital used in the treatment of Medicare patients. Under Part A of the Medicare Act, 42 U.S.C. §§ 1395c–1395i–2, which provides hospital insurance benefits to qualified elderly and/or disabled recipients, hospitals are reimbursed for the "reasonable cost" of providing services to these recipients. The thrust of the plaintiffs' position in this case is that a return on equity is a reasonable cost under the Act and should be reimbursed. Title 42 U.S.C. § 1395x(v)(1)(A) initially defines reasonable cost, for provider reimbursement purposes, as:

> (v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; . . . .

The section further provides the following principle which is to be used to determine whether costs are or are not reimbursable reasonable costs:

> Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . .

The gist of the "necessary costs" requirement is that hospitals will be reimbursed for costs, either direct or indirect, which are attributable to Medicare patients. The Medicare Program is not to be responsible for costs incurred on behalf of non-Medicare patients. If indirect costs are attributable to both Medicare and non-Medicare

patients, the provider will be reimbursed for the proportionate share of such indirect costs as are incurred for the benefits of the Medicare patients. 42 C.F.R. § 405.-451(b)(1) and (c)(3).

The Secretary of Health and Human Services has the responsibility for administering the Medicare Program. 42 U.S.C. § 1395kk. The Secretary is authorized by Congress to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this title." 42 U.S.C. § 1395hh. These regulations are found in the Code of Federal Regulations, Subchapter B, Part 405 of 42 C.F.R. Chapter IV.

The regulations further delineate the types of costs which will be allowable under the Program. These regulations flesh out the general principles laid down in 42 U.S.C. § 1395x(v)(1)(A). One regulation which is at issue in this case, at least indirectly, is 42 C.F.R. § 405.429, which specifically authorizes a proportionate reimbursement for return on equity in the case of proprietary (for profit) hospitals.

§ 405.429 Return on equity capital of proprietary providers.

(a) *Principle.* (1) A reasonable return on equity capital invested and used in the provision of patient care is allowable as an element of the reasonable cost of covered services furnished to beneficiaries by proprietary providers. . . .

(2) For the purposes of this subpart, the term "proprietary providers" is intended to distinguish providers, whether sole proprietorships, partnerships, or corporations, that are organized and operated with the expectation of earning profit for the owners, from other providers that are organized and operated on a nonprofit basis.

(b) *Application*—(1) *Computation of equity capital.* Proprietary providers generally do not receive public contributions and assistance of Federal and other governmental programs in financing capital expenditures. Proprietary institutions historically have financed capital expenditures through funds invested by

owners in the expectation of earning a return. A return on investment, therefore, is needed to avoid withdrawal of capital and to attract additional capital needed for expansion. . . .

Presumably for the reasons expressed in subsection (b), above, the Secretary has made no analogous provision for a return on investment costs in the cases of nonproprietary providers. The plaintiffs in this case are challenging the Secretary's disallowance of a proportionate share of their return on equity costs, primarily on the basis of their perception of the general spirit of 42 U.S.C. § 1395x(v)(1)(A) and on some legislative history.

The first Medicare Regulations, issued by the Secretary in 1966, authorized a reimbursement of an additional 2% of total allowable costs for nonproprietary facilities as compensation for otherwise unspecified costs. One of the costs included in the 2% was a return on equity capital. (See Proposed HEW Regulations, §§ 405.402(e) and 405.428(b) (1966); statements of the Commissioner of Social Security, Robert M. Ball in the *Hearings on Reimbursement Guidelines for Medicare Before the Senate Committee on Financing*, 89th Congress, 2d Sess., at 55–56 (1966), R. 0501–2; and Mr. Ball's comments in the *1966 Hearings* at 72 [R. 0508].) Proprietary hospitals were only given a 1-to-1½% additional reimbursement. The regulation expressly recognized that proprietary hospitals had already been given a return on equity capital reimbursement under § 1395x(v)(1)(B) and 42 C.F.R. § 405.429. 42 C.F.R. § 405.428 (formerly 20 C.F.R. § 405.428).

It is clear that the nonproprietary providers' 2% allowance did include a return on equity capital: it is equally clear that Congress heard discussion of the return on equity issue before these regulations were passed. The problems at issue for the nonproprietary hospital plaintiffs began in June, 1969, when the Secretary dropped both the 2% and the 1½% allowances. 34 Fed.Reg. 9927 (June 27, 1969). As a result, the nonproprietary providers are left with only the "reasonable cost" definition found

in 42 U.S.C. § 1395x(v)(1)(A). Proprietary providers may still be reimbursed for return on equity capital costs pursuant to 42 C.F.R. § 405.429, the regulatory counterpart of § 1395x(v)(1)(A).

The plaintiffs in this case now contend that a return on equity is a "reasonable cost" and that it is anomalous to grant a return on equity capital reimbursement to proprietary but not to nonproprietary providers. The arguments which shore up their contention that Congress intended that all providers be reimbursed for return on equity expenses are based primarily on postenactment legislative history and on more generalized arguments that this expense is a "reasonable cost" within the meaning of 42 U.S.C. § 1395x(v)(1)(A).

### (a) Authority of the Secretary

It is necessary to dispense with two minor arguments made by the plaintiffs before reaching the merits of the return on equity capital issue. The hospitals contend that great deference should be given to the PRRB's decision in favor of the hospitals on the return on equity issue. The decision in favor of the providers was reversed by the Deputy Administrator.

Title 42 U.S.C. § 1395oo(f) states that:
(f) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the [Provider Reimbursement Review] Board's decision, reverses, affirms or modifies (adversely to such provider) the Board's decision. In any case where such a reversal or modification occurs the provider of services may obtain a review of such decision by a civil action commenced within 60 days of the date he is notified of the Secretary's reversal or modification. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located or in the District Court for the District of Columbia . . . .

The Secretary delegated the power to review PRRB decisions to the Administrator of the Health Care Financing Adminis-

tration, 42 Fed.Reg. 57351 (Nov. 2, 1977). That delegation specifically anticipated the possibility of redelegation, stating that "[t]he authority in Section 1878(f) [42 U.S.C. § 1395oo(f)] . . . may only be redelegated to the Deputy Administrator." On September 5, 1979, the Administrator redelegated his authority to review PRRB decisions to the Deputy Administrator.

The hospitals contend that these delegations were against the will of Congress, since Congress had authorized the Secretary to review the Board's decisions. Therefore, they state, the decision of the PRRB is final and the Court has no jurisdiction over this matter. The cases cited by the plaintiff are not on point.

The usual concern of courts in situations of delegation is that important quasi-judicial final decisions not be made by minor subordinates. This is not the case here. First, it is ludicrous to suppose that the Secretary of Health and Human Services could review all PRRB decisions personally. Second, the Deputy Administrator is not a minor official. Third, the very statute upon which the plaintiffs rely, 42 U.S.C. § 1395oo (f), provides for judicial review of the Secretary's decisions.

The Ninth Circuit Court of Appeals has held delegations under HHS's earlier, but analogous, organizational structure to be proper:
Under the Medicare Act, it is the Secretary who may reverse or modify a decision of the PRRB. 42 U.S.C. § 1395oo(f). However, section 8.D of HEW's "Statement of Organization, Functions and Delegations of Authority," 33 Fed.Reg. 5836 (1968), delegates the functions of the Secretary under the Medicare Act to the Commissioner of Social Security. The District Court correctly found that this was a proper delegation, and was properly exercised in this case.
*Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123 (9 Cir. 1980).

■ The delegations of authority to review PRRB decisions by the Secretary to the Administrator, then to the Deputy Ad-

ministrator were valid. This Court may review the decision, albeit made by the Deputy Administrator. The reversal of the PRRB must be viewed as the Secretary's own decision. Not only was the review of the PRRB's decision pursuant to a valid exercise of authority, but the Secretary's decision to deny reimbursement for return on equity must be given a great degree of deference.

### (b) Standard of Review

The standard of review of § 1395oo (f) decisions is specified to be that established by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Section 706 of the APA provides that "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions," and that the court "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ..." 5 U.S.C. § 706.

■ This "arbitrary, capricious, abuse of discretion" standard is not the equivalent of a de novo review. A recent Ninth Circuit case dealt with the nature of judicial review of a decision by the Secretary of Health, Education and Welfare in the context of a Medicare reimbursement dispute. The Secretary's decision interpreted the reasonable return on equity regulation, 42 C.F.R. § 405.429. *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123 (9 Cir. 1980). The court, after setting out the standard of review contained in the APA (5 U.S.C. § 706, above), stated:

The primary question before us is whether the Secretary may interpret and apply the Medicare regulations above as he has done in denying PCME's claims. [Footnote omitted.] Generally, when a meaning of a provision within the expertise of an agency is involved, the courts will afford deference to that agency's construction. In such cases, the agency's expertise make [sic] it particularly suited to interpret the language. This is especially true when an agency's own regula-

tion is involved, and ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with the regulation. [Citations omitted.]

The deference which a reviewing court is to afford to an agency's interpretation of its regulations is not total, however.... As where courts review an agency's construction of a statute which the agency administers, "the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia...." [Citations omitted.] Even though the Medicare reimbursement area is complex, and to a great degree left to the Secretary to structure, [footnote omitted] his interpretations are nonetheless subject to our examination.

*Id.* at 130–31.

The Court in this instance must give deference to the way in which the Secretary interprets his own regulations. However, there is no obligation for the Court to defer to the agency in such matters as challenges to the constitutionality of the Medicare regulatory or statutory scheme. If, for example, a regulation or a construction thereof conflicts with the authorizing congressional statutes or policies underlying those statutes, deference to the Secretary's opinion comes to a halt. *Id.,* at 131–32. The same APA standard of review applies to judicial review of decisions of the PRRB. *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9 Cir. 1979).

The plaintiffs have suggested that the ordinary degree of deference to the Secretary's expertise be lessened in this case because the Secretary reversed the PRRB on the issue of return on equity capital. The government has pointed out that the PRRB now has decided to follow the Secretary's position on the return on equity issue. At this point in the proceedings it does not matter what the PRRB has done.

■ The Secretary has ultimate responsibility and decision-making authority over the Medicare program. It is his decision (the Deputy Administrator's) that the Court is called upon to review. As noted in

*American Medical International, Inc. v. Secretary of Health, Education and Welfare,* 466 F.Supp. 605 (D.D.C.1979), another Medicare reimbursement case:

> Plaintiffs, however, suggest that this Court deviate from the normal rule of deference in this case because the decision of the Provider Reimbursement Review Board differed in substantial part from the Secretary's final decision. As noted, review by this Court shall be "pursuant to the applicable provisions [of the Administrative Procedure Act]." 42 U.S.C. § 1395*oo*(f). [Footnote omitted.] It is well settled that, under the APA, final responsibility for rendering the decision lies in the agency itself, not in any subordinate hearing officers. This is because it is the agency, not any subordinate officers such as the Provider Reimbursement Review Board, that is charged with the responsibility for implementing and administering the agency's program.

*Id.,* 466 F.Supp. at 611. In essence, once the Secretary, or in this case the Deputy Administrator of the Health Care Financing Administration, makes his decision, it is immaterial what the PRRB did. This Court is reviewing, in accordance with APA guidelines, the decision of the Secretary.

*(c) Is a Return on Equity Capital a Reasonable Cost for Nonproprietary Providers Under 42 U.S.C. § 1395x(v)(1)(A)?*

The stance of the Department of Health and Human Services on this issue is that nonproprietary providers may not recoup any Medicare funds for a return on equity. The rationale of the Deputy Administrator is that there is no regulation that authorizes the reimbursement, so if the hospitals are to recover these amounts, it must be done as a reasonable cost under § 1395x(v)(1)(A). The Department's analysis of this statute and its conclusions is set out in the Deputy Administrator's opinion in the group appeal now before the Court:

> It would appear that if a return on equity capital were paid to non-profit hospitals, Medicare would be paying a disproportionate share of provider costs. This is because the return is a profit rather than a cost. Under Section 1861(v)(1)(A) of the Act and the supporting regulations, Medicare reimburses all of a provider's reasonable costs in caring for Medicare beneficiaries. This includes a proportionate share of the cost of capital investment related to patient care such as a building or equipment.
>
> In this case, the Board found that non-profit providers need the funds from the return on equity capital for capital investment purposes, and to cover the costs of bad debts and charity allowances. However, under these circumstances, Medicare would be paying an amount in excess of its share of reasonable cost. This excess would be used to satisfy the burden of non-Medicare patients. This is contrary to the mandate in Section 1861(v)(1)(A) of the Act and the Board's finding in this regard is clearly erroneous.
>
> Based on the specific wording of Section 1861(v)(1)(B) of the Act and 42 CFR 405.-429, and the Congressional comments, the Deputy Administrator finds that a return on equity capital is not an element of reasonable cost for non-profit providers. It is not an out-of-pocket cost and was not the type of cost contemplated as reasonable, either direct or indirect, when Section 1861(v)(1)(A) was enacted. Section 1861(v)(1)(B) was enacted because under Section 1861(v)(1)(A) alone a return on equity capital could not be paid to proprietary providers. Therefore, the Board's reliance on Section 1861(v)(1)(A) in this regard is erroneous.

The Secretary's position in regard to 42 C.F.R. § 405.429 (quoted above, concerning return on equity for proprietary hospitals) is correct. The terms of this statute are explicit in the distinction between proprietary and nonproprietary providers insofar as the return on equity issue is concerned. (In accord, *Valley View Community Hospital v. United States,* 679 F.2d 857 (U.S.Ct. Cl.1982), ¶ 31,978, CCH Medicare and Medicaid Guide.) The rationale for the distinction expressed in the regulation is that proprietary providers must raise capital through funds invested by owners in the

expectation of earning a profit. Alternatively, nonproprietary hospitals have other sources of funding, i.e., public contributions and governmental programs. *Id.*, ¶ 31,978 Medicare and Medicaid Guide, at 9748. The plaintiffs have not brought forward any regulations which affirmatively authorize a return on equity for nonprofit hospitals. They are relegated to the very general reasonable cost standard defined in § 1395x(v)(1)(A).

As noted above, the Secretary's position is that the intent of Congress, as set forth in § 1395x(v)(1)(A), in light of its legislative history, is that a return on equity is not a reasonable cost. This is also the position of the courts which have viewed this issue.

The legislative history of the return on equity issue has been quoted exhaustively by both parties to this litigation. It has also been summarized in *Hospital Authority of Floyd County, Georgia v. Schweiker*, 522 F.Supp. 569 (N.D.Ga.1981).

The plaintiffs' argument that a return on equity is a reasonable cost under § 1395x(v)(1)(A) is not borne out by the legislative history. The bulk of the plaintiffs' authority is testimony from the transcript of the 1966 Senate Finance Committee hearings on the issue of reimbursement guidelines. These hearings were held nearly a year after the Medicare Act was passed by Congress. "Such post-enactment history is not the surest guide of the legislative intent in initially passing the Act. *Cf. Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074 (5th Cir. 1974) [*cert. den. Moon v. Roadway Express, Inc.*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980)]. Nevertheless, the testimony of the witnesses and the remarks of the Senators are quite instructive." *Floyd County, supra*, 522 F.Supp. at 569.

The plaintiffs have placed great stock in statements made by Robert Ball, the Commissioner of Social Security, who agreed with the policy of including a return on equity factor in the 2% allowance, because giving a return on equity solely to proprietary hospitals would foster the "anomalous result" of "reimbursing a profitmaking organization more than a nonprofit organiza-

tion for rendering exactly the same service—solely by reason of allowing return on investment in one case but not the other." *Reimbursement Guidelines for Medicare: Hearing before the Committee on Finance*, United States Senate, 89th Cong., 2d Sess. (Comm. Print, May 25, 1966), at 56 (hereinafter "Hearings"). Mr. Ball and Mr. Willcox, the General Counsel of Social Security agreed that a return on investment was "some bit of this 2% item." *Id.*, at 107. "The Senate Committee, in short, was being told by the Commissioner [Mr. Ball] that no return on equity capital was allowed explicitly, but that a return on equity capital was discreetly included in the 2% allowance." *Floyd County, supra*, at 572.

The idea that even the proponents of a return on equity capital classified it as a portion of the 2% allowance rather than as an automatic "reasonable cost" is significant. Shortly after the hearings Congress amended the Act to provide explicitly for a return on equity to proprietary facilities. Title 42 U.S.C. § 1395x(v)(1)(B), the statutory counterpart of 42 C.F.R. § 405.429, provides:

> (B) Such regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services, in lieu of other allowances to the extent that they reflect similar items [i.e., the 2% allowance]. . . .

Section 1395x(v)(1)(B) and 42 C.F.R. § 405.-429 remained after the 1969 decision to discontinue the 1½% and 2% allowances. The following lengthy portion of the *Floyd County* analysis of the legislative history reveals that the understanding of the Congress was that a return on equity was not provided in the original Act and that it was not within the ambit of a § 1395x(v)(1)(A) reasonable cost:

> Having traced the footprints on the trail of legislative enactment, the Court concludes that it was not the intent of Congress to provide an allowance for a return

on equity capital to all facilities. In reading the transcript of the Senate hearing, it is apparent that the Committee basically approved the Secretary's proposal to table the issue of providing such an allowance. This is what the Health Insurance Benefits Advisory Council recommended, and this recommendation was passed on to the Committee. The decision to amend the Act in October, 1966 to provide for the allowance for proprietary facilities evidences Congressional intent to reverse the former policy of simply obscuring the allowance as a "bit" of the 2% allowance.

The exchanges at the Hearing between various Senators and Mr. Ball and other administrative officials make it quite unequivocal that the Senate Committee members believed that a return on equity capital was not, and should not, be provided. For example:

THE CHAIRMAN [Sen. Russell B. Long]. But did you have the impression anywhere that the congressional intent was that we should have allowed imputed interest on capital?

MR. MYERS [Chief Actuary, Social Security Administration]. No. In making the cost estimates, I had no thought that that would be done.

THE CHAIRMAN. What we are talking about is an item neither you nor we had any idea of allowing. I never had an idea we were going to allow imputed interest. Nobody, so far as I know, in your Department—did your Department have any idea that we were going to allow imputed interest?

MR. BALL. No, Mr. Chairman. And I think one of the main reasons that the staff resisted the tendency of the Health Insurance Benefits Advisory Council to move to this position was not necessarily on the merits of the economic argument, but the fact that it had not been considered, and that it therefore ought to be postponed. That was the thought there.

.        .        .        .        .        .

MR. BALL. Senator, I think the language of the law "reasonable cost" is open to a great variety of interpretations. The discussion, the legislative history, the committee report, pinned that down considerably .... I was answering literally the question of whether the term "reasonable cost" could have included such things [e.g. return on equity capital].

But I don't think it would have been reasonable to so interpret the term in the light of the discussions and the legislative history.

.        .        .        .        .

SENATOR WILLIAMS. In computing the costs incurred, how can you get an estimate for interest which is not owed, not paid? How can you get an allowance for an interest charge not owed and not paid, if you are going to stick to the formula of actual costs incurred?

MR. BALL. We did not accede to this argument for allowing an interest return on equity capital.

Hearings, 49–51.

MR. COHEN [Under Secretary]. I think the point, Senator, is that Congress did, in setting up the concept of reasonable cost, intend for us to reflect what the economic cost of hospital care was. And as Mr. Gordon says, if you were going to pay for the interest on borrowing the money it seems to us to be reasonable to try to reflect in the cost what is actually the incurred cost of a hospital when it has to operate. So while it was not discussed in those specific terms, I think it is absolutely consistent with the intent of Congress that what the program should pay should really reflect what the economic cost is for a hospital in providing these services.

SENATOR ANDERSON. I just could not disagree with you more. We discussed this over and over and over again, and rejected that in the committee. I just call your attention to the committee report, page 33:

The cost of hospital services varies widely from one hospital to another, and the variations reflect differences in quality and cost. The same thing is true with respect to the cost of services provided. The provision in this bill for the payment of reasonable cost of services is intended to meet the actual cost.

"Actual." This is not economic or fanciful or anything else. We put it in there so they could not bring in the various things you are talking about now. How do you get around this?

MR. COHEN. Well I think this is the actual cost. I think when you are talking about economic costs—

. . . . .

SENATOR ANDERSON. Just one more question from page 37 of the report which I think should have some importance to you. I really believe when a committee goes to the extent of preparing a report, and filing it, and telling the Congress and the people that this is what they mean, it is wrong to try to reinterpret it some other way.

In paying reasonable cost, it should be the policy of the insurance program to so reimburse a hospital or other provider that an accounting may be made at the end of each cost period for costs actually incurred.

Not beneficiarily incurred, or anything else—"actually incurred." And if you don't pay interest on a debt, that is not a cost that it actually incurred. id. at 69–70.

At the outset of the hearing, Senator Long, the Chairman, outlined the various topics to be discussed:

Three. Can the reasonable cost include a return on investment for proprietary institutions without a similar payment to the nonprofit facilities. And that is a fair question to be raised. It seems to me that it was intended that there should be a return on investment to proprietary institutions—and that there is no similar requirement that they be made to public or nonprofit groups.

id. at 43.

In addition, when the Act was amended in October, Congressman John W. Byrnes of Wisconsin stated, "[Under existing law] the amount that will be paid to the individual nursing home or facility—shall be, and I quote, 'the reasonable cost' of furnishing such care. In other words, as the law now stands, fundamentally all the Social Security Administration can pay are the costs, with no allowance for profits or a return on the invested capital." 112 Cong.Rec. 28220 (1966). Senator Long made a similar statement to the Senate. "As the proposed Medicare regulations stood [an investor] would only have been reimbursed for the actual costs of providing services with no specific return given on his investment." 112 Cong. Rec. 27608 (1966).

*Floyd County, supra*, at 572–74.

■ This Court concludes, as did the district court for the Northern District of Georgia, *id.*, at 575, that a payment for a return on equity capital is not within the scope of § 1395x(v)(1)(A). The plaintiffs have brought forward no cases which stand as authority for the proposition that a return on equity is a § 1395x(v)(1)(A) reasonable cost. Rather, they have relied on: (1) the PRRB's decision, (2) general policy statements which assert that a policy of nonreimbursement for nonproprietary providers would violate the mandate of § 1395x(v)(1)(A) in that a heavier share of costs would be borne by non-Medicare patients, and (3) analogies to indirect costs which are reimbursed (i.e., straight line depreciation, 42 C.F.R. § 405.415, the 1966–1969 2% allowance, 20 C.F.R. § 405.428, interest on some loans, 42 C.F.R. § 405.-417(c)(2), and return on net assets to proprietary hospitals, 42 C.F.R. § 405.429).

None of these arguments addresses the critical question: did the Secretary misconstrue the statute in denying a return on equity? Given the legislative history quoted above, it is clear that not only did Congress not consider a return on equity when it passed the Medicare Act, it specifically viewed this item during the 1966 Hearings

as an expense which did not fall within the purview of § 1395x(v)(1)(A). When the 2% allowance, some "bit" of which was a return on equity, was abandoned in 1969, the expense, as to nonproprietary providers, returned to its status as a nonreimbursable expense. In light of its legislative history, 42 U.S.C. § 1395x(v)(1)(A) cannot be stretched to cover this item of cost.

Another district court which has considered the issue of whether a return on equity is a reasonable cost was recently upheld by the Court of Appeals for the District of Columbia Circuit. *American Medical International, Inc. v. Secretary of Health, Education and Welfare*, 466 F.Supp. 605 (D.D.C.1979), *aff'd* 677 F.2d 118 (D.C. App.1981). In *American Medical International* the court discussed return on equity capital because the plaintiffs had analogized it to the stock maintenance costs for which they sought reimbursement. The district court stated:

> Plaintiffs argue that stock maintenance costs, though related to investment, should be reimbursed because Medicare allows proprietary providers a return on equity capital. 42 U.S.C. § 1395x(v)(1)(B). [Footnote omitted.] By allowing this payment, plaintiffs contend, the Medicare program expressly recognized that costs related to investment may be reimbursed. This argument assumes that the return on equity capital in § 1395x(v)(1)(B) is a reasonable cost within the meaning of § 1395x(v)(1)(A). However, this return on equity provision was added subsequent to the passage of the Medicare Act and it constitutes the sole exception to the basic Medicare principle that reimbursement be limited to those costs actually incurred in providing patient care services. It is clear from the purpose behind the return on equity provision (§ 1395x(v)(1)(B), its legislative history, and the provision itself that the return on equity capital provision cannot be used by plaintiffs to support the position that reasonable costs under 42 U.S.C. § 1395x(v)(1)(A) was meant to include costs for investment.

*Id.*, 466 F.Supp. at 613. (In accord, *Valley View, supra*.)

Therefore, the Secretary did not misinterpret § 1395x(v)(1)(A), nor do the regulations conflict with the statutory scheme. Although the plaintiffs' policy arguments might have been convincing during the initial stages of legislative debate on the Medicare legislation, they were not accepted by Congress. It is beyond the province of the Court to do more than discern the will of Congress on this issue. A return on equity was not within the definition of reasonable cost originally. Since Congress has done nothing to change the statute in the 13 years since the demise of the 2% allowance, this Court cannot proclaim a return on equity capital to be a § 1395x(v)(1)(A) reasonable cost.

### (d) Does the Statutory or Regulatory Scheme Violate the Just Compensation Provision of the Fifth Amendment?

The plaintiffs contend that if the statutory or regulatory schemes deny a return on equity to nonproprietary providers, they are constitutionally infirm. The hospitals urge that such provisions would violate the Fifth Amendment's mandate that "private property ... [not] be taken for public use without just compensation." The plaintiffs have presented the Court with no cases which support this position. They urge that being denied compensation for the opportunity cost of the assets used in furnishing care to Medicare patients is unjust compensation. If the United States does not pay them for the opportunity cost, the plaintiffs claim that the government is not compensating them sufficiently for property it has taken.

These opportunity cost arguments go to the compensation element and do not need to be answered since the "taking" element of the just compensation clause has not been violated. The plaintiffs have stated that the hospitals are in positions akin to those of public utilities. (Relying on *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).) The basic principle of *Smyth*, as stated by the plaintiffs, is that when a

business dedicates a portion of its property to activities deemed to be affected with a public interest, the Constitution guarantees that the property will not be used for the public benefit without just compensation being paid for the services rendered.

There has been no taking in this case. The utilities cases relied upon by plaintiffs are analogous to the case at bar, but there are important distinctions which prevent the application of the just compensation clause to this issue. *Smyth* was a case in which the state regulated railroad charges. The parties in *Smyth* were railroads and stockholders of railroads, which were for-profit corporations. The plaintiffs in the instant case are nonprofit hospitals: the payment distinctions on the return on equity issue are made on the basis of the differences between profit-making and nonprofit organizations (see 42 C.F.R. § 405.429 and the equal protection discussion below).

The Court identified as unconstitutional takings of property in which property is "wrested" from its owner for the benefit of another or for the public. *Id.*, 169 U.S. at 524–25, 18 S.Ct. at 425, 42 L.Ed. at 841. The prohibition was against "a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business .…" *Id.*, 169 U.S. at 525, 18 S.Ct. at 425, 42 L.Ed. at 841. This "wresting away" and "practically destroying the value of the property" has evolved into a standard which demands at a minimum some loss of use.

The plaintiffs in this case have not demonstrated this type of loss. They have volunteered to participate in the Medicare program. They can terminate their participation now. They may sell their physical plant at any time.

A district court for the Eastern District of New York recently dealt with the just compensation clause's "taking" requirement in a similar case involving Medicaid reimbursement provisions. *Hempstead General Hospital v. Whalen*, 474 F.Supp. 398 (E.D.N.Y.1979), *aff'd* without opinion, 622 F.2d 573 (2 Cir. 1980). The plaintiffs in that case challenged federally approved state limita-

tions on capital cost reimbursements to potential purchasers of health care facilities. They contended that these capital reimbursement limitations constituted a taking because they eliminated many potential buyers of health care facilities. The Medicaid regulations at issue limited capital reimbursement of purchasers to the net depreciated value of the property rather than to either the purchase price or the fair market value. After reviewing the recent just compensation cases, the Court held that there was no taking in spite of the fact that there was a greatly lessened market for hospital facilities and the regulations "impose upon plaintiffs a constantly diminishing potential sale price." *Id.*, 474 F.Supp. at 411.

The reasoning of the *Hempstead* court for the finding of no taking is that critical elements of governmental invasion were missing:

> As before, plaintiffs have full right to use the medical center property. The challenged regulations impose no direct legal restraint upon the property or upon its use. There has been no physical entry by the state, no ouster of the owner, no legal interference with plaintiffs' physical use, possession or enjoyment of the medical center, nor any legal interference with the owner's power of disposition of the property.

*Id.*, at 410–11.

The New York court held that the regulations did not constitute a *de facto* taking, which requires a "physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property of a legal interference with the owner's power of disposition of the property." *Id.*, at 410, citing *City of Buffalo v. J. W. Clement Company*, 28 N.Y.2d 241, 253; 321 N.Y.S. 345, 356; 269 N.E.2d 895, 902 (1971). Neither did the regulations come within the ambit of the cases which deal with unconstitutional regulation of utilities since the plaintiffs "have not lost any existing right of property or contract." *Hempstead, supra*, at 410. Within the context of the

utility overregulation cases, the court set forth the following rule:

> Many kinds of legislative and administrative action affect property values, but, without some diminution in the owner's right of use, do not constitute a taking within the purvue of the Fourteenth Amendment. *Chacon v. Granata*, 515 F.2d 922, 925 (CA5 1975), *cert. denied*, 423 U.S. 930, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975).

*Id.*

The instant case also lacks elements necessary for a taking. The return on equity rules may not be what the hospitals would design for themselves, but since these plaintiffs retain full rights and control over their net investment, the statutory scheme is not constitutionally deficient.

### (e) Does the Statutory or Regulatory Scheme Violate the Equal Protection Clause of the Fifth Amendment?

The plaintiffs claim that the Fifth Amendment is violated if the Medicare statutes and regulations allow or disallow a return on equity solely on the basis of whether a provider is proprietary or nonproprietary. This equal protection argument can only be proved under the Fifth Amendment if the discrimination is "so unjustifiable as to be violative of due process." *Shapiro v. Thompson*, 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600, 619 (1969); *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218, 222 (1964). Therefore, the due process clause of the Fifth Amendment guarantees equal protection. *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 533 n.5, 93 S.Ct. 2821, 2825 n.5, 37 L.Ed.2d 782, 787 n.5 (1973).

The plaintiffs have attempted to support its claims that this distinction is discriminatory with statements by Robert Ball (the "anomalous result" testimony from the *Hearings,* quoted above), a 1966 Memorandum of the Comptroller General of the United States in favor of the 2% allowance and unsupported assertions that the distinction between proprietary and nonproprietary providers is neither rational nor reasonable insofar as the return on equity issue is concerned.

The standard to be applied in cases in which the constitutionality of a social welfare program is challenged is the same low level of scrutiny that is applied to legislation regulating business. *Weinberger v. Salfi*, 422 U.S. 749, 771–72, 95 S.Ct. 2457, 2469–70, 45 L.Ed.2d 522, 542–43 (1975). *Salfi* cited with approval social welfare legislation cases (*Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); and *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)) which "establish that a statutory classification violates due process only if it is 'patently arbitrary ..., utterly lacking in rational justification.' 363 U.S. at 611, 80 S.Ct. at 1372. They establish that a classification violates equal protection only if it lacks a reasonable basis: there is no violation merely because the classification is 'imperfect,' or ' "not made with mathematical nicety or because in practice it results in some inequality." ' 397 U.S. at 485–86 [90 S.Ct. at 1161–62]." *Caylor-Nickel Hospital, Inc. v. Califano*, Civil No. F 77–83 (N.D.Ind. Sept. 10, 1979) ¶ 30,718, CCH Medicare and Medicaid Guide. In *Caylor-Nickel*, Judge Eschbach, with specific reference to the return on equity provisions, held that the regulations which "provide for profit institutions but not to nonprofit institutions" are sufficiently rationally based to satisfy *Salfi*. *Id.,* ¶ 30,718, Medicare and Medicaid Guide at 9098. The reasons for this finding of sufficient rationality to sustain the constitutionality of the statutory and regulatory scheme are that:

> It is certainly rational that profit institutions receive this advantage when nonprofit institutions receive numerous other advantages, such as various grants and contributions, and tax-exempt status. The purpose and rationality of this classification is made clear in 42 U.S.C. § 1395x(v)(1)(A) and in the legislative history .... The distinction drawn be-

tween profit and nonprofit institutions violates nothing in the fifth amendment. *See Am. Med. Int'l, Inc. v. Sec. of H.E.W.*, 466 F.Supp. 605, 615 (D.C.Dist.Columb. 1979).

Other cases which have accepted the rationality of the distinction between proprietary and nonproprietary providers in the context of equal protection challenges are *Valley View, supra; Stevens Park Osteopathic Hospital, Inc. v. United States*, 633 F.2d 1373 (Ct.Cl.1980); and *Floyd County, supra.* Another explanation of the rationality of this distinction, which relies upon the section of Judge Eschbach's opinion quoted above, states:

> Both the Senate Finance Committee staff report and G.A.O. report outline various reasons why profit and nonprofit institutions should be treated differently. Nonprofit institutions have various benefits which are unavailable to proprietary institutions: tax benefits, Hill-Burton grants, charitable donations, and numerous other advantages created by the state and federal governments.

*Floyd County, supra*, 522 F.Supp. at 575–76.

The plaintiffs have brought forward no cases which refute these findings of rationality. The Court must agree that the distinction between proprietary and nonproprietary providers is rationally based.

All of the plaintiffs' return on equity capital claims fail. As to these issues, the Court must grant the defendant's motion for summary judgment.

### (4) Bad Debts and Charity Costs

The hospitals ask the Court either to declare a regulation with respect to bad debts, charity, and courtesy allowances to be inconsistent with the "reasonable cost" requirement of § 1395x(v)(1)(A), or to rule that it violates the due process clause of the Fifth Amendment. The hospitals claim that because bad debts and charity not attributable to Medicare patients are categorized by accountants as economic costs of running a hospital, the Medicare program should reimburse them for a proportionate share of these costs.

The Secretary has great leeway to formulate standards for the determination of which are "reasonable costs" under 42 U.S.C. § 1395x(v)(1)(A). In 1966, the Secretary promulgated the following regulation, now challenged by the plaintiffs:

§ 405.420 Bad debts, charity, and courtesy allowances.

(a) *Principle.* Bad debts, charity, and courtesy allowances are deductions from revenue and are not to be included in allowable cost; however, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the program.

(b) *Definitions*—(1) *Bad debts.* Bad debts are amounts considered to be uncollectible from accounts and notes receivable which were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the rendering of services, and are collectible in money in the relatively near future.

(2) *Charity allowances.* Charity allowances are reductions in charges made by the provider of services because of the indigence or medical indigence of the patient.

(3) *Courtesy allowances.* Courtesy allowances indicate a reduction in charges in the form of an allowance to physicians, clergy, members of religious orders and others as approved by the governing body of the provider. Employee fringe benefits, such as hospitalization and personnel health programs, are not considered to be courtesy allowances.

(c) *Normal accounting treatment: Reduction in revenue.* Bad debts, charity, and courtesy allowances represent reductions in revenue. The failure to collect charges for services rendered does not add to the cost of providing the services. Such costs have already been incurred in the production of the services.

. . . .

(g) *Charity allowances.* Charity allowances have no relationship to beneficiaries of the health insurance program and

are not allowable costs. The cost to the provider of employee fringe-benefit programs is an allowable element of reimbursement.

From the above it will be noted that plaintiffs are specifically allowed to collect every penny of bad debts attributable to the deductibles and coinsurance amounts which Medicare patients fail to pay. In other words, payments are reduced in the first instance by applicable deductibles and coinsurance amounts, 42 U.S.C. § 1395e; 42 C.F.R. § 405.110(b). Notwithstanding such fact, the amount of these reductions is eventually paid to plaintiffs to the extent that plaintiffs are not otherwise able to collect the same. 42 C.F.R. § 405.-420(a). Since the exact amount of the bad debts incurred by Medicare patients in the foregoing areas is reimbursed, it is logical to deny reimbursement, either directly or as an item of overhead, of similar losses of revenue attributable to non-Medicare patients, in keeping with the Congressional policy as expressed in 42 U.S.C. § 1395x(v)(1)(A).

With respect to charity allowances, this Court has previously held, in a case which would apply to a great many of the plaintiffs in this action, that the cost of services furnished to indigents because of the free care obligation imposed by the receipt of Hill-Burton Act funds are indirect costs within the meaning of the Medicare legislation and as such are proportionately reimbursable. *Johnson County Memorial Hospital, et al. v. Schweiker*, 527 F.Supp. 1134 (S.D.Ind.1981). Beyond that, however, it is difficult to find a justification for the plaintiffs' position.

The Congress has said that costs attributable to non-Medicare patients are not to be borne by the Medicare program. All of the items excluded by 42 C.F.R. § 405.420(a) are just such costs or, more accurately, lack of revenue. The challenged regulation appears to be in complete harmony with both the letter and the spirit of the statute, and the decision of the Board with respect thereto is correct.

To summarize, the motion for partial summary judgment of plaintiff Indiana Hospital Association, Inc. is denied. The motion of the defendants to dismiss Cause No. IP 76–522–C for lack of subject matter jurisdiction will be granted. The final decision of the Secretary is affirmed, and summary judgment will be rendered in favor of the defendants in the consolidated cases.